503 So.2d 1052 (1987)
William R. ADAMS, Plaintiff-Appellee/Appellant,
v.
Lilly J. ADAMS, Defendant-Appellee/Appellant.
No. 18433-CA.
Court of Appeal of Louisiana, Second Circuit.
February 25, 1987.
*1054 C. Calvin Adams, Tallulah, for plaintiff-appellee/appellant.
LeRoy Smith, Jr., Tallulah, for defendant-appellee/appellant.
Before FRED W. JONES, Jr., NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
William and Lilly Adams were separated by a judgment of separation from bed and board which was rendered on September 19, 1985. Thereafter, the parties entered into a community property settlement contract on September 24, 1985. However, the parties failed to attach to the community property settlement contract an exhibit which described the immovable property belonging to the community. The immovable property described on the exhibit was to be conveyed to Mr. Adams. He was to assume all community debts. William Adams brought suit on October 14, 1985, seeking to force Lilly Adams to sign an amendment to the community property settlement contract which would include the required property descriptions. The suit was later amended to include the description of the "Gin lot," a parcel of land which neither William Adams nor Lilly Adams realized they owned until after the community property settlement contract was negotiated and signed. In her answer to William R. Adam's petition, Lilly Adams requested that the contract be set aside in its entirety due to failure of consent. She also sought alimony pendente lite, despite a provision in the community property settlement contract wherein she purportedly waived her rights to alimony of any kind. The trial judge found the community property settlement contract to be valid and ordered it amended to add the requested immovable property descriptions, including a description of the "Gin Lot," and ordered that Lilly Adams receive $600 per month as alimony pendente lite. For the reasons discussed below, the judgment of the trial court is affirmed in part and reversed in part.

BACKGROUND FACTS
William and Lilly Adams were married on June 25, 1972 and lived together as husband and wife until their legal separation. Once William and Lilly Adams decided to separate they went to the office of Calvin Adams, attorney and brother of William Adams, to seek advice. It was determined that a separation would be obtained by Mrs. Adams based upon the grounds of abandonment and that a community property settlement would be entered into as quickly as possible. A judgment of separation from bed and board was obtained on September 19, 1985.
Calvin Adams, and numerous other people, advised Lilly Adams to obtain her own attorney. However, Mrs. Adams testified that she trusted Calvin Adams and she felt that he would be fair to her. Additionally, Mrs. Adams was worried about the expense of obtaining her own attorney. She was also concerned about William Adams' threat of declaring bankruptcy and leaving her with one-half of the large and numerous community debts which totalled $349,678.99. Hence, Mrs. Adams relied upon the advice of Calvin Adams.
Immediately after obtaining their separation, William and Lilly Adams inventoried the household items together, with William Adams assigning a value to the items. Together, the parties decided that certain movable property would go to Mrs. Adams and others to Mr. Adams. Moreover, Mrs. Adams was to receive $10,000 in cash and a new automobile, plus automobile and hospitalization insurance for one year. Mr. Adams was to receive the community immovable property described on "Exhibit B" of the contract and he was to assume all the community debts.
Mrs. Adams testified that Mr. Adams consistently told her that she must take the property as offered and agree not to seek alimony. If she refused, he would have to *1055 file bankruptcy. Moreover, Mrs. Adams stated that Mr. William Adams cursed her and although he never hit her, he did shake her several times.
Mrs. Adams obtained a copy of the proposed community property settlement contract on September 23, 1985. Attached to the proposed contract was the exhibits, one of which was Exhibit B. Exhibit B contained the property description of the immovable property, with the exception of the description of the "Gin Lot." Cliff Adams, father of William, testified that he saw Mrs. Adams at her home on the night of September 23, 1985. The community property settlement contract was laid out on a kitchen cabinet. She stated to him that she basically understood the contract, but did not understand a portion of the contract that was typed single spaced. He explained to her that these were descriptions of the various tracts of immovable property owned by the community.
Mrs. Adams testified that she spoke to two different attorneys about the community property settlement contract before she signed it. The first attorney told her that she (the attorney) could not tell Mrs. Adams anything until she investigated the Adams' financial situation and had a chance to look at the proposed community property settlement. Likewise, the second attorney consulted by Mrs. Adams stated that, even though he had a copy of the proposed community property settlement contract, he could not tell her if the division of property was fair until he investigated the community's financial standing. On September 24, 1985, Mrs. Adams proceeded to sign the contract which purported to settle the community.
As required by the contract, William Adams attempted to obtain releases for Mrs. Adams from debts due on the real estate which was conveyed to him in the community property settlement contract. In so doing, it was discovered that the attachment to the contract which described the various tracts of immovable property had been inadvertently omitted from the contract which was actually signed and filed in the conveyance records of Madison Parish. Thus, pursuant to a provision in the community settlement contract, Mr. Adams requested that Mrs. Adams sign an amendment adding these various property descriptions. Mrs. Adams spoke with her attorney about signing the amendments and was advised not to sign. Because of her refusal to sign, William Adams filed this suit.

ACTION BY THE TRIAL COURT
The trial court found the community property settlement contract to be valid, despite Mrs. Adams' contention that it was void for lack of consent. Further, the court ordered that the contract be amended to include "Exhibit B" as originally written, and that "Exhibit B" be amended to include a description of the "Gin Lot." Last, the trial court awarded Mrs. Adams the sum of $600 per month as alimony pendent lite.

ISSUES
Mrs. Adams appeals, assigning as error the trial court's determination that the contract is valid, that "Exhibit B" be incorporated into the contract and that the "Gin Lot" also be included. William Adams answered the appeal and assigns as error the trial court award of alimony pendente lite to Mrs. Adams.

I. FAILURE OF CONSENT
Mrs. Adams contends that the community property settlement contract should be voided in its entirety because of the failure of her consent. A contract is formed by the consent of the parties established through offer and acceptance. LSA-C.C. Art. 1927. Consent may be vitiated by error, fraud, or duress. LSA-C.C. Art. 1948. Mrs. Adams contends that the consent given by her to the contract was induced through error, fraud and duress.

A. Error
The cause which prompted Lilly Adams and William Adams to enter into the subject contract was the equitable division of all assets which formerly comprised the *1056 community which existed between them. The error complained of lies in the omission from the subject contract of their interest in certain immovable property (the "Gin Lot") owned by them. The cause of the error was the ignorance of both Lilly Adams and William Adams at the time the contract was entered into of any ownership interest in that property. Apparently, William Adams' father had donated a share of ownership in this property to them while they were out of the state. Lilly Adams contends that the omission of the Gin Lot is sufficient error to cause the entire contract to be declared null and void.
Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, or should have regarded, as a cause of the obligation. LSA-C.C. Art. 1950. In the instant case, the error does not concern a cause of the contract since the contractual object is the division of the community property listed in the contract. Neither party knew of their interest in the "Gin Lot" and therefore, neither could have intended to maintain or relinquish their interest in that lot. While it is probable that the parties believed they had divided the entirety of the community property owned by them, (see discussion of intent, infra) the contract reflects an intent to change the ownership interest of the parties only as to the listed assets. Therefore, the error in ommitting from the contract an asset which neither party knew they owned is not one which can cause the contract to be declared null. Hence, this portion of the assignment of error lacks merit.

B. Fraud
Article 1953 of the Louisiana Civil Code defines fraud as the misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. However, fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations. LSA-C.C. Art. 1954. Unlike the vice of error, which vitiates consent only when it concerns a cause without which the obligation would not have been incurred, the error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance which has substantially influenced that consent. LSA-C.C. Art. 1955. Last, fraud may be established by a preponderance of the evidence and may be established by circumstantial evidence. LSA-C.C. Art. 1957.
Mrs. Adams contends that fraud is established by two facts. The first is the trust she placed in Calvin Adams. The second is the statements made by Calvin and William Adams' that unless Mrs. Adams accepted the community property settlement as proposed, Mr. Adams would be forced to declare bankruptcy and Mrs. Adams would have to take responsibility for her share of the community debts. Mrs. Adams placed emphasis on the trust that she placed in attorney Calvin Adams to fairly represent her, as well as her husband. However, the essential concept from which fraud evolved is not the relationship of trust, but the misrepresentation or suppression of the truth.[1]
If the truth were misrepresented or suppressed herein, it would be in the claims of impending bankruptcy and the sharing of community debts. William Adams' sole source of income is from farming. The community property settlement contract establishes the value of the community assets at $400,277.33. These values were not contested at trial. Likewise, the community *1057 property settlement contract establishes the community debt at $349,678.89. Mr. Adams testified that his farming operation was faltering. Under these circumstances we cannot say that bankruptcy would not be a serious consideration at the time the contract was confected. Moreover, Mrs. Adams would continue to be liable for community obligations. See: LSA-C.C. Art. 2367.
For the reasons given above, and because the burden of proof was on Mrs. Adams, we conclude that she had not proved a misrepresentation or a suppression of the truth. Therefore, this assignment of error is without merit.

C. Duress
Mrs. Adams also contends that she was under great duress during this time. In addition to the emotional and psychological strain of going through a separation, Mrs. Adams testified that she was placed in a situation in which she felt she was expected to make a quick decision as to the community property settlement contract. Moreover, if she failed to agree to the property settlement she would be faced with huge debts and no way of paying them. Additionally, Mrs. Adams testified that although William never hit her, he did shake her at times. Also, the parties to cursed each other on occasion.
Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party's person, property, or reputation. Age, health, disposition, and other personal circumstances of a party must be taken into account in determining reasonableness of the fear. LSA-C.C. Art. 1959.
Most of the violence or threats of which Mrs. Adams complained surround the claims by Mr. Adams to declare bankruptcy and statements made to Mrs. Adams concerning her obligation to pay her portion of the community debts. However, a threat of doing a lawful act or a threat of exercising a right does not constitute duress. LSA-C.C. Art. 1962.
Another aspect of the duress claimed by Mrs. Adams is the emotional and mental strain caused by going through a separation and division of property. However, the conflicting emotions caused by the strain of going through a critical period in one's life is not the type of strain constituting legal duress. Compare: Allen v. Volunteers of America, 378 So.2d 1030 (La.App. 2d Cir.1979).
Last, Mrs. Adams failed to prove a reasonable fear of unjust or considerable injury to her person. There is some testimony that Mr. Adams had physically shaken her prior to the separation. However, if any violence occurred by Mr. Adams, there is no testimony establishing it was in any way associated with the community property settlement contract. For the foregoing reasons, this portion of the assignment of error also lacks merit.
In light of the above, we conclude that the trial judge did not err in holding that the community property settlement contract was valid and binding.

II. ADDITION OF THE "GIN LOT" AND EXHIBIT "B"
In her second assignment of error, Mrs. Adams contends that the trial court erred in ordering that the community property settlement contract be amended to include the description of various tracts of real estate belonging to the community, including the "Gin lot." When the community property settlement contract was signed by William and Lilly Adams, the notary preparing the documents failed to include several pages of "Exhibit B," which was attached to and made a part of the community property settlement contract. The missing pages contained the missing real estate descriptions. The part of "Exhibit B" which was attached to the contract contained a description of various mortgages. William Adams had agreed to assume the debts and mortgages and to hold Lilly Adams harmless from any liability imposed by these mortgages. Prior to signing the contracts, Mrs. Adams had a copy of the contract to review which included these real estate descriptions. However, the "Gin *1058 Lot" was not included in "Exhibit B" since neither party realized they had an ownership interest in it when the exhibit was prepared.
Interpretation of the contract is the determination of the common intent of the parties. LSA-C.C. Art. 2045. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. LSA-C.C. Art. 2050. The intent of the parties is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences. Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982); Amoco Production Company v. Slaughter, 491 So.2d 760 (La.App. 1st Cir.1986). In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the parties who furnished its text. LSA-C.C. Art. 2056; Ouachita National Bank of Monroe v. Williamson, 338 So.2d 172 (La.App. 2d Cir. 1976).

Exhibit "B"
We find that the community property settlement contract establishes the clear intent of the parties that Lilly Adams was to transfer to William Adams her ownership interest in any of the immovables owned by the community and originally listed in "Exhibit B" (i.e., exclusive of the "Gin Lot"). The contract provides that Lilly Adams is to take "the property and cash described and with the values shown in Exhibit A." William Adams is to take "the property described in Exhibit B" and is to assume the community liabilities listed in Exhibit B-1. The liabilities listed in Exhibit B-1 are the mortgages attached to the real estate listed in Exhibit B. Additionally, the contract provides that William Adams "does transfer, deliver and convey unto Lilly J. Adams the entirety of his interest in and to all the property herein above allotted to her, and particularly all movable property and cash described in the aforesaid Exhibit A." Moreover, Lilly J. Adams "does transfer, convey and deliver unto William R. Adams the entirety of her interest in and to all the properties herein above allotted to him, and particularly all movable and immovable property described in the aforesaid Exhibit B." Last, the contract provides that "William R. Adams further acknowledges and covenants that the mortgages and mortgage balances which he assumes (and for which he agrees to idemnify and hold harmless Lilly J. Adams for any part of the payment thereof) shall be any balance on any community mortgage and balance whether accurately set forth or not."
The clear language of the contract shows that the parties intended that the immovable property described as Exhibit "B" was to be conveyed to William Adams. Therefore, we find that the trial judge did not err in ordering that the community property settlement contract be amended to include all the properties listed in "Exhibit B" as "Exhibit B" was originally written, i.e. exclusive of the Gin Lot.

The "Gin Lot"
We find that the trial court erred in ordering that the "Gin Lot" be included with the other immovables listed on "Exhibit B." There is no indication that either party intended for the community property settlement contract to affect their ownership in the "Gin Lot." William argues that it was the intent of the parties that he have complete ownership of all community immovables and that the contract contains an omnibus description of the immovables. However, the community property settlement contract clearly states that Lilly Adams transfers her interest in all the properties allotted to William Adams, and particularly all "immovable property described in the aforesaid `Exhibit B.'" The contract does not contain broad language which would indicate a delivery of "all immovables owned by the community." Neither party knew that they had an ownership interest in the "Gin Lot." Since the contract does not provide that all community immovables are to be transferred to William Adams, there could have been no intent to convey the undescribed and unknown "Gin Lot" to him. Hence, we find *1059 that the trial court erred in ordering that the community property settlement contract be amended to include the "Gin Lot." That property is not affected by the community property settlement contract and it remains owned in indivision by the parties.

III. ALIMONY PENDENTE LITE
The community property settlement contract contains the following clause:
For the consideration of the division of the community between the parties as set forth above, Lilly J. Adams does further declare and acknowledge that she does hereby, knowingly and intelligently, waive her rights to any and all payments for support, alimony pendente lite and/or permanent alimony of any nature, kind or description whatsoever, other than the sums of money received by her by virtue of this partition, and she does forever and without qualification renounce all rights to any type of alimony in the future or to seek an increase for any reason at any time in the payments provided herein including but not limited to such reasons as illness, loss of income, and/or inflation.
The trial court determined that this clause did not waive Lilly's right to alimony pendente lite. The community property was distributed so that the net value of the assets given Lilly amounted to $35,544.00 and the net assets given to William amounted to $15,054.44. An even division of the assets would have given each party the sum of $25,299.22. The trial court found that the extra payment given Lilly in the property settlement could be construed as a "payment for alimony pendente lite, both alimony pendente lite and permanent alimony, or ... as simply a payment for permanent alimony and the right to any increase in the future." Because the document was prepared by Mr. Adams and/or his counsel, Calvin Adams, it was construed against him. Thus, the additional payment was not part of a rehabilitive arrangement in exchange for alimony pendente lite.
In Holliday v. Holliday, 358 So.2d 618 (La.1978) the Louisiana Supreme Court held the provision of an antenuptial agreement in which the plaintiff/wife waived her right to alimony pendente lite in the event of judicial separation from bed and board was null and void as against the public policy established in LSA-C.C. Art. 119 that a husband and wife owe to each other mutually, fidelity, support and assistance.
The situation in Holliday was different from that presented in Fontenot v. Klumpp, 461 So.2d 579 (La.App. 3rd Cir. 1984), writ denied, 465 So.2d 738 (La.1985). Fontenot was distinguished from Holliday because in Holliday, the waiver of alimony pendente lite did not provide alternative means of support, while in Fontenot the wife was provided a monthly payment in lieu of alimony pendente lite. Hence, public policy was not contravened since the wife received support. Therefore, in Fontenot the waiver of alimony pendente lite was allowed. Thus, alimony pendente lite may be waived by a spouse, provided that an alternative means of support is provided for the waiving spouse.
In this case, the net value of the community was $50,598.44. Thus, if each party received an even share, each would have obtained $25,299.22 in community assets. However, Lilly obtained assets valued at $35,544, while William obtained assets valued at $15,054.44. The question presented is whether the extra $10,000 Lilly received in excess of her 50% ownership of the community was given as rehabilitative alimony in lieu of alimony pendente lite or as an inducement to agree to the proposed division of assets.
We determine that the trial court erred in holding that the community property settlement contract was ambiguous and that the $10,000 received by Lilly in excess of her 50% ownership in the community was not given in lieu of alimony pendente lite. The instrument signed by the parties is entitled "Community Property Settlement with Lump Sum Payment in Lieu of Alimony Pendente Lite and Permanent Alimony." The only lump sum mentioned in the contract is $10,000 in cash, which happens to approximate the value of the excess assets received by Lilly. While *1060 the cash sum is listed as a part of the division of the community, the clause waiving alimony makes specific reference to how the community assets were divided, i.e. "for the consideration of the division of the community between the parties as set forth above ..." Likewise, the contract states that Lilly Adams waives all alimony "other than the sums of money received by her by virtue of this partition," i.e., the $10,000. Therefore, we determine that the $10,000 given to Lilly in the community property settlement was given to her in lieu of her rights to alimony pendente lite.
Additionally, we find that the phrase waiving Lilly's right to alimony is not ambiguous. The contract clearly states that alimony pendente lite is waived. First, alimony pendente lite is specifically mentioned in the caption to the agreement. Second, the clause waiving alimony states that Lilly waives her rights to "any and all payments for support, alimony pendente lite and/or permanent alimony of any nature, kind or description whatsoever ..." Moreover, the contract continues and states that Lilly "does forever and without qualification renounce any rights to any type of alimony in the future ..." Thus, the parties clearly intended that Lilly would not be eligible for alimony pendente lite and that Lilly would be given an extra $10,000.00 as rehabilitive alimony.

CONCLUSION
Therefore, we uphold the ruling of the trial court in all respects, except in the awarding to Mrs. Adams of alimony pendente lite and the inclusion of the "Gin lot" in the community property settlement contract. Insofar as the trial court judgment awards alimony pendente lite to Mrs. Adams and amends the subject contract to include the "Gin lot", the judgment is reversed and set aside.
Accordingly:
IT IS ORDERED, ADJUDGED, AND DECREED, that the "Community Property Settlement With Lump Sum Payment in Lieu of Alimony Pendente Lite and Permanent Alimony," recorded in COB "68" at page 1, bearing register no. 71009 of the conveyance records of Madison Parish, Louisiana, is a valid and binding partition agreement between the parties and that lesion is not applicable here.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that there be judgment herein in favor of plaintiff, William R. Adams, recognizing his ownership of the community immovable property described on "Exhibit B" referred to hereafter and amending the "Community Property Settlement With Lump Sum Payment in Lieu of Alimony Pendente Lite and Permanent Alimony", referred to above, to include and recognize his ownership of the immovable property previously owned by the community previously existing between William R. Adams and Lilly J. Adams, consisting of that property described on "Exhibit B", pages 2 through 7, attached to and made a part of the trial court judgment, with the exception of the immovable property referred to in these proceedings as the "Gin Lot", which is fully described hereafter.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the following described immovable property, referred to in these proceedings as the "Gin Lot", forms a part of the community of acquets and gains formerly existing between William R. Adams and Lilly J. Adams and was not partitioned by the above mentioned contract and remains owned in indivision by the parties, the property being described in Exhibit B of the trial court's judgment, page 7.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the judgment in favor of Lilly J. Adams awarding her the sum of $600.00 per month alimony pendente lite effective from November 22, 1985 is reversed and set aside.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the damages sought by William R. Adams against Lilly J. Adams are denied.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the costs of these proceedings in the trial court and *1061 in this Court are apportioned equally between the parties.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] There is no allegation that the attorney for William Adams acted in any unethical manner. In fact, Calvin Adams, the attorney, and several other people advised Mrs. Adams that she should seek independent counsel.