745 So.2d 61 (1999)
Deno Joseph BOUDREAUX, PlaintiffAppellee,
v.
Constance Diane Carpenter BOUDREAUX, Defendant Appellant.
No. 98-791.
Court of Appeal of Louisiana, Third Circuit.
June 2, 1999.
Writ Denied October 29, 1999.
Keith Edward Thibodeaux, St. Martinville, for Deno Joseph Boudreaux.
Paul Albert Landry, Lafayette, for Constance D. Carpenter Boudreaux.
BEFORE: YELVERTON, COOKS, PETERS, SAUNDERS, and GREMILLION, Judges.
COOKS, J.
Constance Diane Carpenter Boudreaux appeals the judgment of the trial court finding a Post-Nuptial Agreement she and her husband executed invalid. For the following reasons, we affirm.

*62 FACTS
On June 2, 1993, Constance Boudreaux filed for divorce from her husband, Deno Boudreaux. They had been married eight years. After the filing, they met to talk about some type of agreement they could reach. During the course of this meeting, Deno agreed to meet with Constance and her attorney, Kathleen Hite, for the purpose of entering into some type of written agreement between them.
The meeting at Constance's attorney's office took place. According to Deno, he signed this agreement under the pressure of a divorce, in order to save his marriage:
I signed the contract by pressure, and I call that threatened. That Connie, Constance Boudreaux and Kathleen Hite told me, if I may say. She says, "If you don't sign this agreement, I will divorce you." I said, "No. That's not what I want. I don't want a divorce. I want us to try to work out things and keep our home." That's what I said.
The agreement is entitled "Post Nuptial Agreement Between Constance Dianne Carpenter Boudreaux And Deno Boudreaux" and is dated June 24, 1993. In that contract, Deno agreed if he filed for divorce for any reason, including adultery, he would pay to Constance $1,500.00 per month alimony for support and maintenance. This was qualified by the following sentence: "This amount will be base [sic] on each of the parties present comparable salaries." Further, Deno agreed to keep Constance on his present group hospitalization plan, and in the event of cancellation or change, he would seek other insurance.
The parties further agreed that Constance could live in the family home as long as she remained single. In the event Constance remarried, the home would be sold and the proceeds split equally. The same provision existed in the event Constance filed for divorce from Deno with the further stipulation that if she remarried, Deno could live in the home upon reimbursing Constance for one-half the value of the house.
Deno was also required to continue to deposit any and all payroll, bonuses, or expense checks, or any other employment checks, or cash into Constance's and Deno's bank account for the purpose of paying the bills for their home. The remainder of the money deposited was to be used for the living expenses of Constance.
After the contract was signed, Constance dismissed her suit for divorce. Deno followed the terms of the contract, depositing monies into the designated bank account monthly. Then on April 22, 1997, approximately four years later, Deno filed for divorce. In his petition he asked the trial court to nullify the Post-Nuptial Agreement.
The trial court granted the divorce and invalidated the Post-Nuptial Agreement. In brief oral reasons for judgment, the court found the contract void as against public policy, finding Deno could not divest himself of all of his income and resources. Further, the trial court found Deno executed the Post-Nuptial Agreement under duress. Finally, the trial court said the contract was not in compliance with the legal requirement that spouses seek court approval of any agreement which terminates or modifies the matrimonial regime. Constance appealed the trial court's judgment, asserting three assignments of error:
1. The District Court erred in its conclusion that the Post-Nuptial Agreement was against public policy.
2. The District Court erred in its conclusion that the Post-Nuptial Agreement was invalid due to the failure of the parties to get judicial approval prior to entering into the agreement.
3. The District Court erred in its conclusion that Deno entered into the Post-Nuptial Agreement under duress.

*63 ANALYSIS

1. Did the Post-Nuptial Agreement violate public policy?
"Parties are free to contract for any object that is lawful, possible, and determined or determinable." La.Civ. Code art.1971. Further, spouses are free to contract with one another before or during marriage as to all matters that are not prohibited by public policy. La.Civ. Code art. 2329; Tolar v. Tolar, 25,935 (La.App. 2 Cir. 6/22/94), 639 So.2d 399.
The Civil Code guides us in the interpretation of contracts. La.Civ.Code art.1983 provides:
Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith.
The interpretation of a contract is determined by the common intent of the parties. La.Civ.Code art.2045. When the words of a contract are clear, explicit, and do not lead to absurd consequences, no further interpretation may be made as to the parties' intent. La.Civ.Code art.2046. Further, each provision in a contract must be interpreted in light of the other provisions so that each provision is given the meaning suggested by the contract as a whole. La. Civ.Code art.2050. We keep these principles at the forefront in considering the Post-Nuptial Agreement.
Constance argues the Post-Nuptial Agreement is "in essence, ... a contractual alimony agreement," and thus may be enforced. We have reviewed the cases that hold a promise to pay alimony after divorce can be the subject of a contract. See, Cunningham v. Cunningham, 448 So.2d 910 (La.App. 3 Cir.1984); Klein v. Klein, 485 So.2d 970 (La.App. 5 Cir.1986), writ denied, 489 So.2d 921 (La.1986); Jones v. Jones, 459 So.2d 1200 (La.App. 5 Cir.), writ denied, 462 So.2d 649 (La.1984). However, these cases deal with contractual alimony and consent decrees after the parties have separated. All the noted contracts were confected during the pendency of a divorce action which ended the marriage. Thus, the circumstances surrounding perfection of these contracts are distinguishable from the present case.
The agreement to pay alimony, regardless of faulteven adultery, is in our view against public policy, and renders the agreement void. Such a contract would undermine the sanctity of marriage, and would encourage the parties to approve adulterous conduct for a price. La.Civ. Code art. 98 provides "[m]arried persons owe each other fidelity, support and assistance." The fourth circuit in Favrot v. Barnes, 332 So.2d 873, 875 (La.App. 4 Cir.), writ denied, 334 So.2d 436 (La.), reversed on other grounds, 339 So.2d 843 (La.1976), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), specifically "reject[ed] the view that a premarital understanding can repeal or amend the nature of marital obligations as declared by C.C. 119 [now La.Civ.Code art. 98]."
This Post-Nuptial Agreement clearly attempts to affect the parties marital and familial duties during the marriage, not after the marriage. The trial court was correct in declaring it invalid.

2. Were the parties required to seek judicial approval of the agreement?
The trial court, additionally, held the Post-Nuptial Agreement was invalid because the parties did not obtain judicial approval as required by La.Civ.Code art. 2329, which provides:
Spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy.
Spouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules. They may, however, subject themselves to the *64 legal regime by a matrimonial agreement at any time without court approval.
(Emphasis added).
In Poirier v. Poirier, 626 So.2d 868 (La. App. 3 Cir.1993), writ denied, 94-161 (La.3/11/94), 634 So.2d 389, this court enunciated on the needs for strong safeguards against attempts to modify or terminate the matrimonial regime:
Since we find the Poiriers intended the agreement to terminate the matrimonial regime, the agreement is governed by Article 2329 and the formalities contained therein. Obviously, the Legislature found many spouses possessed such inferior bargaining positions, that the law could not allow them to give up their community rights without judicial supervision. In face of this strong legislative policy, we find the formalities of Article 2329 to be stricti juris.
Poirier, 626 So.2d at 870.
It is undisputed that judicial approval was not obtained prior to or at any time during the parties' execution of the Post-Nuptial Agreement.
The trial court found the Post-Nuptial Agreement modified the matrimonial regime, thus requiring court approval prior to the parties entering the agreement. We agree. The agreement required prior judicial approval because "in operation" it clearly encumbered the future use and sale of a community asset, the home. As a consequence, it constituted a modification of the matrimonial regime.
Constance cites Langley v. Langley, 94-726 (La.App. 3 Cir. 12/7/94), 647 So.2d 640, urging that spouses who are anticipating a divorce can enter into an interspousal contract that divides existing assets and debts without judicial approval. However, unlike the couple in Langley, Deno and Constance did not enter into the Post-Nuptial Agreement in contemplation of a divorce. Rather, they signed the agreement to avoid a divorce. The facts in this case are distinguishable from those presented in Langley; and its holding, thus, is not controlling. The trial court did not err in holding the Post-Nuptial Agreement invalid for this reason as well.
Because we find the trial court did not err in finding the agreement invalid for the reasons thus mentioned, we elect not to address its finding that the agreement was invalid because Deno executed it under duress.

DECREE
For the foregoing reasons, we affirm the judgment of the trial court declaring the Post-Nuptial Agreement invalid and unenforceable. Costs of this appeal are assessed against plaintiff-appellant, Constance Diane Carpenter Boudreaux.
AFFIRMED.
YELVERTON, J., dissents and assigns reasons.
PETERS, J., dissents for the reasons assigned by YELVERTON, J.
YELVERTON, J., Dissenting.
The contract provisions that Deno pay all his earnings into an account for payment of the house bills, with the balance to belong to Constance, are no longer enforceable, because those provisions were intended to apply only during the marriage, not after a divorce. Their validity is no longer at issue. There were other, separate alimony provisions in the contract to be applied in the event of a divorce. These provisions are now applicable, and I would uphold these provisions as a valid interspousal agreement not against the public policy of this State. Our court has consistently upheld the right of spouses to contract with each other pertaining to alimony after divorce. Romero v. Romero, 509 So.2d 681 (La.App. 3 Cir.), writ not considered, 512 So.2d 427 (La.1987); Wagner v. Wagner, 535 So.2d 1269 (La.App. 3 Cir.1988), writ denied, 538 So.2d 592 (La. 1989); King v. King, 390 So.2d 250 (La. App. 3 Cir.1980), writ denied, 396 So.2d 884 (La.1981).
*65 The contract clearly expresses an intent that Constance receive alimony after divorce, regardless of fault, to be based on the parties' comparable salaries. The majority finds Cunningham v. Cunningham, 448 So.2d 910 (La.App. 3 Cir.1984), Klein v. Klein, 485 So.2d 970 (La.App. 5 Cir.), writ denied, 489 So.2d 921 (La.1986), and Jones v. Jones, 459 So.2d 1200 (La. App. 5 Cir.1984), writ denied, 462 So.2d 649 (La.1985), distinguishable in that the agreements reached between the spouses in those cases were reached after the parties separated, whereas in Deno's and Constance's case, they entered the agreement while still married. I fail to see the distinction. The Cunningham, Klein, and Jones cases stand for the proposition that alimony after divorce can be the subject of a contract and is considered a consent decree. In Klein and Jones the parties entered the agreements prior to divorce, and the courts found these agreements to be valid. See also Beringer v. Beringer, 415 So.2d 429 (La.App. 1 Cir.1982) and Tschirn v. Tschirn, 504 So.2d 1110 (La. App. 5 Cir.), writ denied, 506 So.2d 1226 (La.1987).
Our courts have also addressed the effect a finding of mutual fault or open concubinage has on a spouse's agreement to pay alimony after divorce. Notably, in Tschirn, 504 So.2d 1110, and Klein, 485 So.2d 970, the fifth circuit upheld alimony agreements entered into by the parties prior to divorce notwithstanding a finding of mutual fault which would ordinarily terminate a spouse's obligation to pay alimony. La.Civ.Code art. 160. In fact the Klein court found it significant that the wife entered the agreement prior to a judgment of separation finding her to be mutually at fault. Further, in Romero, 509 So.2d 681, and Becker v. Becker, 94-1224 (La.App. 1 Cir. 5/5/95), 654 So.2d 1365, writ denied, 95-1719 (La.10/13/95), 661 So.2d 498, the courts upheld alimony agreements and refused to terminate the husbands' obligations to pay alimony after divorce where the wives began living in open concubinage, even though in non-contractual alimony cases, the obligation to pay alimony would cease upon the obligee spouse entering opening concubinage. Former La.Civ.Code art. 112(A)(4).
Here, although ordinarily alimony after divorce could be denied to a spouse at fault in the marriage, the parties specifically contracted around this. Deno and Constance have chosen to provide alimony after divorce on Constance's behalf despite the Civil Code's dictates that only a spouse not at fault in the breakup of a marriage is entitled to permanent support. The jurisprudence specifically allows spouses to contract pertaining to alimony after divorce. "In the absence of a vice of consent, a court cannot undermine a contract simply because it was a bad deal for one of the parties." Becker, 654 So.2d at 1369.
Contrary to the majority's opinion, I do not find that such an agreement would go against the dictates of La.Civ.Code art. 98. Deno, in agreeing to provide his wife final periodic support, recognized his obligation of support and agreed to meet this obligation. In return for Deno's agreement, Constance dropped her suit for divorce. Contrary to the majority's conclusion, this agreement had the effect of continuing the spouses' marital obligations under Article 98. In fact, the parties then remained together approximately four years until Deno, not Constance, sought a divorce. I therefore do not find this agreement contrary to public policy.
Likewise, I find this agreement to be a valid interspousal contract not subject to the requirement of judicial approval. I read the case of Langley v. Langley, 94-726 (La.App. 3 Cir. 12/7/94), 647 So.2d 640, differently from my colleagues. Langley makes it clear that a matrimonial agreement affects the classification of future assets and property of the community regime and therefore requires judicial approval, whereas an interspousal contract affects only existing assets and debts of the spouses and thus eliminates the need for judicial intervention.
*66 The parties in Langley entered joint stipulations dividing their present property and debts prior to the filing of a divorce petition. Notably, the court found this to be an interspousal agreement and stressed the importance that this agreement, affecting the present property of the spouses, did not terminate the community. Regardless of the fact that the parties subsequently sought a divorce, the court found the agreement valid because it did not terminate the matrimonial regime; the agreement affected only presently existing community property.
Today, spouses are free to sell or lease property to one another, donate existing property to one another, and partition existing community property without judicial approval. Those transactions which affect existing property of the community can be the subject of interspousal agreements. Katherine S. Spaht and W. Lee Hargrave, Matrimonial Regimes § 8.6 at 529, § 8.12 at 552 respectively, in 16 Louisiana Civil Law Treatise (1997). The agreement between Mr. and Mrs. Boudreaux contemplated only existing property-the community home. This agreement did not affect the classification of any future property nor did it terminate the community regime. Therefore, court approval was not required.
Further, agreeing to a contract in response to a threat of divorce was not duress in this case. La.Civ.Code art.1962; Adams v. Adams, 503 So.2d 1052 (La.App. 2 Cir.1987); Dornier v. Live Oak Arabians, Inc., 602 So.2d 743 (La.App. 3 Cir.), writ denied, 608 So.2d 177 (La.1992); Autin v. Autin, 617 So.2d 229 (La.App. 5 Cir.), writ denied, 620 So.2d 846 (La.1993).