760 So.2d 469 (2000)
Iona Senora Wells WILLIAMS
v.
Michael David WILLIAMS.
No. 99-1101.
Court of Appeal of Louisiana, Third Circuit.
April 12, 2000.
Rehearing Denied May 24, 2000.
*470 Martha A. O'Neal, DeRidder, LA, Counsel for Plaintiff/Appellee.
E. Gray Burnes Talley, Burnes, Burnes & Talley, Alexandria, LA, Counsel for Defendant/ Appellant.
(Court composed of Chief Judge NED E. DOUCET, Jr., Judge BILLIE C. WOODARD, Judge OSWALD A. DECUIR, Judge MARC T. AMY, Judge GLENN B. GREMILLION).
GREMILLION, Judge.
In this case, the defendant, Michael David Williams, husband of the plaintiff, Iona Senora Wells Williams, appeals the judgment of the trial court which upheld a post-nuptial agreement entered into by the couple. Michael appealed. For the following reasons, we reverse and render.

FACTUAL AND PROCEDURAL BACKGROUND
Iona and Michael were married on July 12, 1996, after having dated and lived together for many years. Agreements affecting the matrimonial regime and spousal support were subsequently confected and are at issue in this suit. Following an original handwritten agreement allegedly signed by the parties in January 1997, the parties signed an agreement on July 2, 1997, before a notary and two witnesses.[1] The face of the document indicates that the couple agreed to terminate the community property regime and, further, provided, that in the event of separation or divorce, Michael would provide the following support for Iona: $2,500.00 per month, medical, and health insurance coverage for the remainder of her life, and medical/health expenses not covered by insurance. The agreement also provided that Michael would maintain a life insurance policy on himself and designate Iona as the beneficiary.
In a Joint Petition for Modification of Matrimonial Regime, filed on July 7, 1997, the parties presented the agreement and represented to the trial court that they were subject to the "legal regime of community property under the laws of the *471 State of Louisiana," that they wished to terminate the community property regime, and that they had reached an agreement as to the division of community property they believed to be fair and equitable. By this joint petition, they asked "that they be allowed to terminate the legal regime of community property presently existing between them and to establish and enter into a regime of separation of property, as allowed by Civil Code Article 2329."
On July 9, 1997, the trial court signed the following order: "IT IS ORDERED that Michael David Williams and Iona Senora Wells Williams be and are hereby allowed to terminate the legal regime of community property as allowed by Civil Code Article 2329." The order and the agreement were filed with the Clerk of Court for Beauregard Parish on July 14, 1997.
The instant matter was instituted on June 15, 1998, when Iona filed a Petition for Divorce alleging that she was entitled to divorce, pursuant to La.Civ.Code art. 102, after she and Michael had lived separate and apart in excess of 180 days. She further asked for a hearing on a motion to show cause why Michael should not provide the support described in the above agreement. An order to show cause was subsequently signed by the trial court. In a separate action, Iona filed a Petition for Breach of Contract and Enforcement of Contract to Terminate Matrimonial Regime, wherein she alleged entitlement to enforcement of the provisions of the marital agreement. Following Michael's filing of a rule to show cause, a Judgment of Divorce was signed and filed on January 21, 1999. As the issues remaining in each of the actions filed by Iona dealt with enforcement of the marital agreement, the two matters were consolidated.[2]
Following the filing of additional motions regarding the agreement and alimony by Iona, a hearing was held on the matter on March 4, 1999. During the hearing, Iona sought enforcement of the terms of the agreement, while Michael contended, chiefly, that he entered into the agreement out of duress and that the contract should not be enforced either due to a failure of cause or because the terms are against public policy. The trial court heard witness testimony, including that of the parties, and also reviewed exhibits, including the petition to terminate the marital regime, the order doing so, and the signed agreement. The court found in favor of Iona, giving the following reasons for enforcement:
We have two documents in evidence here, P-1, which is dated January 10, 1997; and the court record in C-97-614, which basically is a contract styled "Termination of Matrimonial Regime Between Michael David Williams and Iona Senora Wells Williams" and the petition, which asks for permission to terminate. Both of those documents were signed by Michael David Williams, the P-1, there having been some notations made on by him in addition to his signature. The termination document was executed nearly seven months later, on July 2, 1997, prepared by an attorney which both Mr. Williams and Ms. Williams state was their attorney. The Court finds no reason why the provisions of the termination of matrimonial regime document, including the paragraph B which refers to payment of alimony pendente lite or permanent alimony, why these should not be enforced. My primary reason that I do not think that there is any reason why they should not be enforced is I do not see that there was any duress which would have continued from January 10 up to July 2, 1997. There may have been some duress that may have arisen from some other things; but, generally speaking, I believe that this was a document that *472 Mr. Williams was quite willing to execute of his own free will, although it may have been that he was doing so because he thought it would make things better at home.
In any event, I think it's extremely significant that this couple had been together for a period of 19 years and lived together for a period of ten years. And, quite frankly, I think when [counsel for Michael] asked Ms. Williamsor Ms. Wellswhy Mr. Williams would want to execute an agreement that provided for this, I think it pretty well summed it up that he felt responsible, that they had been together all this time, that she had done a lot of things for him during that time. In short, that he felt it was his moral responsibility.
Therefore, it is the holding of the Court that there is no need for a fault hearing in this matter; that the parties have contractually agreed to the payment of interim spousal supportwhich was previously called alimony pendente lite and permanent alimonyin the amount of $2,500 per month. And that is the Court's ruling.
Michael appeals, assigning several errors, primarily arguing that the agreement was not statutorily sufficient, no lawful cause existed for the obligation, and, alternatively, that the agreement was entered into as a result of duress. Iona has answered the appeal alleging that Michael's appeal is frivolous and requesting attorney's fees and expenses associated with the appeal.

DISCUSSION

Validity of Matrimonial Agreement
In his first assignment of error, Michael contends that the trial court erred in not finding that the agreement was invalid due to statutory deficiencies. He contends that the agreement did not comply with La.Civ.Code art. 2329, in that no judicial determination was made that the agreement was in the best interest of the parties and that the parties understood the governing principles and rules.
The Louisiana Civil Code provides:
Art. 2328. Contractual regime; matrimonial agreement
A matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime. Spouses are free to establish by matrimonial agreement a regime of separation of property or modify the legal regime as provided by law. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect.
Art. 2329. Exclusion or modification of matrimonial regime
Spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy.
Spouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules. They may, however, subject themselves to the legal regime by a matrimonial agreement at any time without court approval.
During the first year after moving into and acquiring a domicile in this state, spouses may enter into a matrimonial agreement, without court approval.
We begin our review by observing that this is not a case where the parties entered into the agreement within the first year of moving into and acquiring domicile in the state, a situation which would not have required court approval according to the third paragraph of Article 2329. Rather, the agreement at issue was entered into during the marriage and required judicial approval as described in the second paragraph of Article 2329. Thus, the trial court was required to make a twofold determination: 1) that the joint petition to *473 terminate the matrimonial regime serves the parties' best interests and; 2) that the parties understand the governing principles and rules.
Despite the necessity for the trial court's consideration of the matrimonial agreement before it was signed, there is no indication that any procedure was followed in this case other than the submission of a joint petition with the attached agreement, which was followed by an order by the trial court. According to Article 2329, this procedure, as a matter of law, was insufficient to terminate the matrimonial regime and, therefore, we find error in the trial court's failure to recognize the lack of compliance with the codal requirement.[3]See Poirier v. Poirier, 626 So.2d 868 (La.App. 3 Cir.), writ denied, 634 So.2d 389 (La.1994); Lauga v. Lauga, 537 So.2d 758 (La.App. 4 Cir.1989). Because the matrimonial agreement does not meet the formal requirements found in Article 2329, we find that it is null and void insofar as it modifies or terminates the matrimonial regime of the parties.
However, our analysis does not end there because the agreement entered into between the parties did not simply attempt to terminate the matrimonial regime. Rather, it contained language involving spousal support upon the event of separation or divorce. We shall consider whether those terms of the agreement are enforceable.
We recently visited this issue in the factually similar case of Boudreaux v. Boudreaux, 98-791 (La.App. 3 Cir. 6/2/99), 745 So.2d 61, wherein we found a post-nuptial agreement requiring the payment of alimony regardless of fault to be void because it was against public policy.[4] In our view, the analysis should not stop here. Article 2328 defines a matrimonial agreement as "a contract establishing a regime of separation of property or modifying or terminating the legal regime." The article further allows spouses to "establish, by matrimonial agreement, a regime of separation of property or modify the legal regime as provided by law." Note also, that Article 2329 allows spouses to "enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy." Before we can begin an analysis of the meaning of these articles, we must define legal regime. "The legal regime is the community of acquets and gains established in Chapter 2 of this Title." La.Civ. Code art. 2327. The "Title" set forth in the Article 2327 is Title VI (of Book III, Of the Different Modes of Acquiring the Ownership of Things) entitled "Matrimonial Regimes." Chapter 2 of Title VI is entitled "The Legal Regime of Community of Acquets and Gains," which sets forth, among other things, the general dispositions of the type of property a spouse can own, the ownership of that property, the acquisition of community and separate property, the management of the community property, and the termination of the community. At no place in Title VI, Matrimonial Regimes, Chapter 2, the Legal Regime of Community of Acquets and Gains is there mentioned alimony (now periodic spousal support). We, therefore, initially conclude that a matrimonial agreement cannot affect periodic spousal support, as it is not contemplated in the meaning of "legal regime." That being the case, the matrimonial agreement, which can only modify or terminate the legal regime, cannot establish periodic spousal support.
Further, under Article 2328, a matrimonial agreement is also a contract establishing a regime of separation of property. *474 The clear wording of this portion of the statute provides only that the spouses may establish a separate property regime and not that they may contract for periodic spousal support.
Accordingly, under Article 2329, spouses may enter into a matrimonial agreement before or during marriage, and that matrimonial agreement may only establish a regime of separation of property or modify or terminate the community of acquets and gains as set forth in Chapter 2 in Title VI.
The rules governing periodic spousal support are found in Book I (Of Persons), Title V (Divorce), Chapter 2 (Provisional and Incidental Proceedings). Under those articles, final periodic spousal support may be awarded to a party who is (1) free from fault, (2) based on the needs of that party, and (3) the ability of the other party to pay. La.Civ.Code art. 111.
We are cognizant of a line of cases, including Langley v. Langley, 94-726 (La. App. 3 Cir. 12/7/94), 647 So.2d 640, Klein v. Klein, 485 So.2d 970 (La.App. 5 Cir.1986), writ denied, 489 So.2d 921 (La.1986), Jones v. Jones, 459 So.2d 1200 (La.App. 5 Cir.), writ denied, 462 So.2d 649 (La.1985), and Cunningham v. Cunningham, 448 So.2d 910 (La.App. 3 Cir.1984), which have held that a promise to pay alimony after divorce can be the subject of a contract. We distinguished those cases in Boudreaux, and do so herein, finding that those cases dealt with contractual alimony and consent decrees after the parties had separated. In those cases, the contracts were confected during the pendency of a divorce action which ended the marriage, unlike this case, where the matrimonial or post-nuptial agreement was confected, as in Boudreaux, to save the marriage.
We are also cognizant of the recent case of McAlpine v. McAlpine, 94-1594 (La.9/5/96); 679 So.2d 85, which dealt with an antenuptial agreement which was confected approximately six weeks before marriage wherein the wife agreed to a separate property regime and a waiver of alimony pendente lite and permanent alimony. The agreement also provided that the wife would receive $25,000 at divorce, if the parties were married less than six years, and $50,000 if they were married six years or more, regardless of fault or need on the part of the wife. The supreme court, on rehearing, upheld the antenuptial agreement, concluding that such an agreement was not against public policy because "permanent alimony was not enacted to protect a public interest, but for the benefit of individuals. Further, we conclude that if protection of the public interest was ever a proper consideration for permanent alimony, that day has long since passed." Id. at 87. We also find McAlpine distinguishable from the instant case. Here, we have a post-nuptial matrimonial agreement which provided for the payment of alimony, regardless of fault, need, or ability to pay, while in McAlpine, the agreement was antenuptial and waived the right to alimony (but provided for a lump sum payment in the case of divorce).
We, further, consider whether, under Article 2329, the matrimonial agreement at issue is "prohibited by public policy." While it is clear under McAlpine that the waiver of alimony by a spouse in an antenuptial matrimonial agreement is not void as against public policy, the question is still unsettled as to whether a matrimonial agreement providing for alimony to a spouse regardless of fault or need on the part of the obligee spouse, or ability to pay on the part of the obligor spouse is void as against public policy. Article 111 provides for an award of final periodic spousal support "to a party free from fault prior to the filing of a proceeding to terminate the marriage based on the needs of that party and the ability of the other party to pay, in accordance with the following Articles." La.Civ.Code art. 112 provides certain relevant factors the court must consider "in determining the entitlement, amount, and *475 duration of final support."[5] La.Civ.Code art. 114 provides that an "award of periodic support may be modified if the circumstances of either party change, and shall be terminated if it has become unnecessary." In La.Civ.Code art. 115, the obligation of spousal support is extinguished by, among other things, the remarriage of the obligee or a judicial determination that the obligee has cohabited with another person of either sex in the manner of married persons. Considering the intent of the legislature in the promulgation of the aforementioned articles, one could easily conclude that it is against public policy to allow a spouse to obligate him/herself, by matrimonial agreement, to pay permanent periodic spousal support, regardless of a determination of fault, need, or ability to pay. We, therefore, find, as we did in Boudreaux, that such an agreement is void as against public policy and, accordingly, unenforceable.
Since we find merit in Michael's first assignment of error, we need not consider his other assignments of error grounded on the trial court's finding of a moral obligation owed by Michael to Iona or the issue of duress.

Iona's Answer to the Appeal
Iona filed an answer to Michael's appeal asserting that we should assess attorney's fees, court costs, and expenses, contending that Michael's arguments are frivolous. Since we have found merit in Michael's assignments of error and reverse the trial court, we find no merit in Iona's Answer.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed. We find that the matrimonial agreement at issue in this case is null, void, and unenforceable. Costs of this appeal are taxed against the plaintiff-appellee, Iona Senora Wells Williams.
REVERSED AND RENDERED.
WOODARD, J., dissents for the reasons assigned by AMY, J., and for the reasons assigned by YELVERTON, J. in Boudreaux v. Boudreaux, 98-791 (La.App. 3 Cir.6/2/99); 745 So.2d 61.
AMY, J., dissents and assigns reasons.
AMY, J., dissenting in part.
I agree with the majority that the portion of the contract entered into by the parties that constitutes the "matrimonial agreement" as discussed in La.Civ.Code art. 2328 is unenforceable as it is statutorily insufficient. However, I dissent from the remainder of the opinion. My approach to the analysis required initially differs from the majority in that I conclude that although the agreement at issue contains an unenforceable "matrimonial agreement," i.e., that species of agreement Article 2328 defines as "establishing a regime of separation of property or modifying or terminating the legal regime[,]" it also contains distinct spousal support provisions. As drafted, these spousal support provisions do not affect the matrimonial regime, are not contractually interdependent with the other provisions, and, in my opinion, are severable from the "matrimonial agreement." Therefore, I find that the spousal support portion, being severable, may still be enforceable when analyzed separately.
In Langley v. Langley, 94-726 (La.App. 3 Cir. 12/7/94); 647 So.2d 640, a panel of this court observed that contracts between spouses are classified as either matrimonial agreements or interspousal contracts. Unlike the matrimonial agreement discussed *476 in La.Civ.Code art. 2329, the latter contract does not require judicial approval. Id. The court stated that "[w]hile a matrimonial agreement affects the classification and management of future assets, interspousal contracts affect only existing assets and debts, and spouses who are anticipating a divorce can enter into an interspousal contract that divides existing assets and debts without judicial approval." Id. at p. 3; 642. The court concluded that "Joint Stipulations" entered into by the parties in Langley did not affect the classification and management of future assets and, thus, did not require judicial approval. Id.
I find this reasoning applicable in the instant matter insofar as the Williamses intended to divide existing assets and debts as well as establish guidelines for future spousal support. Having considered the code article, I conclude that, by its wording, Article 2329 is applicable only to those portions relating to the matrimonial agreement. The other matters, spousal support and community property existing at the time of the agreement, are correctly seen, under the facts of this case, as interspousal contracts, separate from the matrimonial agreement regarding the termination of the matrimonial regime. Addressing Langley and the concept that Article 2329 is inapplicable to such interspousal contracts, the commentators of the Louisiana Civil Code Treatise explained as follows:
The agreement [in Langley], however, was more than a partition. It also was a contractual stipulation of alimony, another type of interspousal contract that is not subject to the procedure of Civil Code Article 2329contractually designating alimony is not the establishment or termination of a matrimonial regime.
The Langley result seems more consistent with the legislation than the results in Ducote v. Ducote [442 So.2d 1299 (La.App. 3 Cir.1983), writ denied, 445 So.2d 439 (1984)] and Poirier v. Poirier [626 So.2d 868, writ denied, 94-0161 (La.3/11/94); 634 So.2d 389], cases which the court of appeal distinguished rather than overruled. The court reasoned that in the earlier cases the cause or motivation of the parties was to terminate the community regime as well as partition existing assets, arguably making the entire agreement void for failure to comply with Article 2329. In Langley, the parties did not intend to terminate the regime by their agreement, thus making the court findings unnecessary to the validity of the agreement. However, in Ducote and Poirier, even if the spouses had two objectivesto terminate the regime as well as partition existing assetsit should have been possible to simply hold that the community was not terminated. That result would not require upsetting the partition of existing assets by contract. The fact that two types of agreements with different levels of formalities are incorporated into one document should not nullify those parts sustainable according to the lesser formal requirements.

KATHERINE S. SPAHT AND W. LEE HARGRAVE, LOUISIANA CIVIL LAW TREATISE, MATRIMONIAL REGIMES § 8.12 (1997) (footnotes omitted) (emphasis added). As I have explained above, I view the agreement as one consisting of both a matrimonial agreement, which requires specific formalities, and an interspousal contract. Therefore, under the facts involved in this case, finding the matrimonial agreement or community termination language severable from the remainder of the agreement, I turn to consideration of the spousal support provisions, an area in which my view also differs from that of the majority.
First, I do not conclude that the trial court was required to find public policy problems inherent in the support provisions. La.Civ.Code art. 1968 provides that the cause of an obligation is unlawful if enforcement of the obligation produces "a result prohibited by law or against public policy." In the recently rendered opinion *477 of Boudreaux v. Boudreaux, 98-791, p. 2 (La.App. 3 Cir. 6/2/99); 745 So.2d 61, 62, writ denied, 99-1935 (La.10/29/99); 748 So.2d 1165, a case referenced in the majority opinion, a panel of this court considered a situation in which a couple entered into a post-nuptial contract wherein Mr. Boudreaux "agreed if he filed for divorce for any reason, including adultery, he would pay to [Mrs. Boudreaux] $1,500.00 per month alimony for support and maintenance." The court concluded as follows:
The agreement to pay alimony, regardless of faulteven adultery, is in our view against public policy, and renders the agreement void. Such a contract would undermine the sanctity of marriage, and would encourage the parties to approve adulterous conduct for a price. La.Civ.Code art. 98 provides "[m]arried persons owe each other fidelity, support and assistance." The fourth circuit in Favrot v. Barnes, 332 So.2d 873, 875 (La.App. 4 Cir.), writ denied, 334 So.2d 436(La.), reversed on other grounds, 339 So.2d 843 (La.1976), cert. denied, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976), specifically "reject[ed] the view that a premarital understanding can repeal or amend the nature of marital obligations as declared by C.C. 119 [now La.Civ.Code art. 98]."
This Post-Nuptial Agreement clearly attempts to affect the parties marital and familial duties during the marriage, not after the marriage. The trial court was correct in declaring it invalid.
Id. at p. 4-5; 63. Although the contract in the instant matter does not include "regardless of fault" language, it provides the general statement that "[i]n the event the parties shall separate and/or divorce, Michael David Williams shall pay alimony pendente lite and/or permanent alimony...." (Emphasis added.) The wording of this contract could be construed as being similar to that involved in Boudreaux, particularly since both were created during the marriage.
However, I decline to follow Boudreaux in this case insofar as it declares the agreement to pay alimony, regardless of fault, against public policy. Rather, I find instructive the Louisiana Supreme Court's discussion in McAlpine v. McAlpine, 94-1594 (La.9/5/96); 679 So.2d 85, wherein the court declared that an antenuptial waiver of permanent alimony is not against public policy as the statute governing alimony is one involving private, not public, interests. Thus, the supreme court concluded that standard contractual guidelines prevail in consideration of such agreements. In my opinion, a post-nuptial, pre-separation contract establishing the guidelines for spousal support is similarly subject to principles regarding obligations. Considering the supreme court's discussion, I conclude that like the contract at issue in McAlpine, the spousal support contract now at issue is not against public policy.
Having found that the spousal support portion of the agreement is severable from that affecting matrimonial regime, and concluding that its contents are not against public policy, I also find no merit in Mr. Williams' other assertions as to why the contract should not be upheld. First, Mr. Williams not only argues that the agreement is against public policy, but that the reasons he entered into the contract, to reduce extreme marital discord and to satisfy Ms. Williams, are insufficient cause. La.Civ.Code art. 1971 instructs that "[p]arties are free to contract for any object that is lawful, possible, and determined or determinable." However, the Civil Code requires that the obligation have a lawful cause. La.Civ.Code art. 1966. Cause may be unlawful if "the enforcement of the obligation would produce a result prohibited by law or against public policy." La.Civ.Code art. 1967.
The trial court determined that Mr. Williams entered into the alimony agreement because he cared for Ms. Williams and felt that it was his "moral responsibility." My review of the testimony supports this finding. I also note that this type of cause, Mr. Williams' desire to provide security for his wife or a feeling of "moral responsibility," is sufficient cause for an obligation. Comment (c) to Civil Code Article 1967 explains:

*478 Under this Article "cause" is not "consideration." The reason why a party binds himself need not be to obtain something in return or to secure an advantage for himself. An obligor may bind himself by a gratuitous contract, that is, he may obligate himself for the benefit of the other party without obtaining any advantage in return....
Therefore, the trial court's finding that Mr. Williams wanted to provide for his wife fits within the codal concept of "cause."
Finally, I find no merit in Mr. Williams' assertion that the trial court erroneously determined that he did not enter into the contract under duress. My review of the trial court's reasons for ruling indicates that the evidence of physical abuse and threats complained of by Mr. Williams were considered by the trial court, but were ultimately discounted as the reason why the contract was signed. Rather, the trial court specifically found that the agreement was one "Mr. Williams was quite willing to execute of his own free will...." I find no evidence in the record so compelling to require the trial court to find otherwise.
For these reasons, I respectfully dissent, in part, from the majority opinion.
NOTES
[1] We refer to the July 2, 1997 document in its entirety as an "agreement." As seen below, however, this generic reference to the document is not to be confused with that portion of the document which addresses the termination of the matrimonial regime and which we refer to specifically, as a "matrimonial agreement."
[2] For appeal purposes, the consolidated matter is discussed under the above-docket number. See Williams v. Williams, 99-1102 (La. App. 3 Cir. 4/12/99); 760 So.2d 478.
[3] While this finding is true with regard to the termination of the marital regime as of the date of the agreement, the separation of any community assets existing at the time of the agreement remains unchanged. See Poirier, 626 So.2d 868.
[4] We also found the post-nuptial agreement in Boudreaux to be null and void because it lacked court approval.
[5] Those factors may include: (1) the needs of the party; (2) the income and means of the party, including the liquidity of such means; (3) the financial obligations of the party; (4) the earning capacity of the parties; (5) the effect of custody of children upon a party's earning capacity; (6) the time necessary for the claimant to acquire appropriate education, training, or employment; (7) the health and age of the parties; (8) the duration of the marriage; (9) and the tax consequences to either or both parties. Article 112 also provides that the sum awarded shall not exceed one-third of the obligor's net income.