679 So.2d 85 (1996)
Michael L. McALPINE
v.
Jonnie Fox McALPINE.
No. 94-C-1594.
Supreme Court of Louisiana.
September 5, 1996.
*86 Mitchell J. Hoffman, Suzette M. Smith, Lowe, Stein, Hoffman, Allweiss & Hauver, New Orleans, for applicant.
Phillip A. Wittmann. Rachel W. Wisdom, Kelly M. Legier, Stone, Pigman, Walther, Wittmann & Hutchinson, for respondent.

ON REHEARING
VICTORY, Justice.[*]
We granted rehearing in this case to reconsider the correctness of our original opinion in which we held that antenuptial agreements waiving permanent alimony are null and void as against public policy. After further review, we reverse our original opinion and hold that such antenuptial agreements are enforceable, but are subject to the same grounds for rescission as other contracts. Further, we agree with the trial court's determination in this case that Mrs. McAlpine entered into the antenuptial agreement freely and voluntarily and not under undue duress. Lastly, consistent with our original opinion, we agree with the trial court's holding that the Mercedes Benz was not a gift to Mrs. McAlpine.

FACTS AND PROCEDURAL HISTORY
About a week prior to their marriage in 1989, Michael McAlpine and Jonnie Fox signed an antenuptial agreement which provided for a separate property regime and for a waiver of alimony pendente lite and permanent alimony. The agreement provided, inter alia, that Jonnie Fox would receive $25,000 at divorce if the parties were married less than six years and $50,000 if they were married six years or more, regardless of fault or need on the part of Jonnie Fox. The parties were divorced on May 18, 1992. On October 5, 1992, Jonnie Fox McAlpine filed a rule to show cause why she (1) should not be awarded permanent alimony pursuant to article 112 of the Louisiana Civil Code, and (2) should not have a Mercedes Benz automobile returned to her, claiming it to be a gift to her from Mr. McAlpine.
The trial court held the antenuptial agreement to be enforceable, held that the Mercedes Benz was not a gift, and dismissed Mrs. McAlpine's rule. The Fourth Circuit Court of Appeal reversed the trial court's ruling in part, holding the antenuptial agreement void as against public policy, but affirmed the trial court with regard to the *87 automobile, and remanded the case for further proceedings. McAlpine v. McAlpine, 93-2467 (La.App. 4th Cir. 5/17/94), 637 So.2d 1163. Mr. McAlpine's writ of certiorari was granted, 94-1594 (La.9/30/94), 642 So.2d 860, and on original hearing, with Justice Kimball dissenting, this Court affirmed, concluding that LSA-C.C. art. 112 was enacted to protect the public interest by preventing needy former spouses from having to seek public assistance and that any act in derogation of article 112 is void under LSA-C.C. art. 7. 94-1594 (La.2/9/95). LSA-C.C. art. 7 provides that "[p]ersons may not by their juridical acts derogate from laws enacted for the protection of the public interest. Any act in derogation of such laws is an absolute nullity." LSA-C.C. art. 7.
We now conclude that permanent alimony was not enacted to protect the public interest, but for the benefit of individuals. Further, we conclude that if protection of the public interest was ever a proper consideration for permanent alimony, that day has long since passed.

DISCUSSION
Article 6 of the Code Napoleon, the original source of LSA-C.C. art. 7, provides "one may not by private conventions derogate from the force of laws which concern public order and good morals."[1] Planiol explains that this test gives a necessary sanction to a great number of legal provisions which do not specifically define their degree of authority. The law very often sets forth a rule without saying whether or not it permits derogations from its provisions. 1 Planiol, Civil Law Treatise, No. 290 (La. State Law Institute Translation 1959). Planiol's fourth category of private laws affecting public order is the protection of contracting parties.[2] He explains:
(4) Protection of the Contracting Parties. A new conception of public order here presents itself. The modern law-maker, considering that the two parties to a certain juridical act are not equally able to defend their interests, prohibits them from departing from certain rules which he has laid down for their protection. It is for this reason that almost all provisions relating to contracts of labor are of public order because the law-maker desires to protect the laborer or the employee against the master. And likewise in contracts for transportation by land all clauses providing for irresponsibility are prohibited (Art. 103, Commercial Code, amended by the law of March 17, 1905). This is done because the law-maker thinks that the traveler or shipper is constrained to submit to the will of the carrier. And again, in contracts of insurance, the law of July 13, 1930 was made imperative, because the insured could not discuss upon a plane of equality with the insurer.
Id., No. 292, p. 201.
Nowhere in Planiol do we find a reference to permanent alimony as enacted for the public interest or order. Rather, Planiol states:
Divorce having destroyed the marriage, no effects of it should continue. Upon what idea is founded persistence of the obligation of support between two persons who have nothing in common? Its basis is found in a principle already mentioned more than once. Whatever act of man causes damage to another obliges him by whose fault it happened to repair it, says Art. 1382. As long as the marriage lasted it gave each of the spouses an acquired position upon which each could count. The community of life permitted the spouse without means to share the welfare of the other. Suddenly through no fault of the spouse in question, he or she find himself or herself devoid of resources and plunged into poverty. It is manifestly in such a case as this that the guilty party should be made to bear the consequences of his wrongful acts.

*88 It is thus seen that the responsibility for alimony is based upon a concept entirely foreign to Art. 212.[3] It is no longer a duty due by a spouse to a spouse because there are no longer any spouses. The duty is to make pecuniary amends for the consequences of an illicit act. This obligation subsisting after divorce partakes, in the highest degree, of the nature of an indemnity. It is intended to restore to the spouse without means something of the resources of which he or she is thenceforth deprived through the other's fault.
This indemnity nevertheless merely counterbalances the privation of the right of support which was vested in the spouse. It becomes transformed into alimony. This is why alimony follows the general rules applicable to alimentary pensions.
Id., No. 1259, pp. 696-697 (cites omitted throughout).
Prior to 1855, a wife, after obtaining divorce, was not entitled to alimony in Louisiana. See Player v. Player, 162 La. 229, 110 So. 332 (1926).[4] In 1855, article 160 was adopted, granting alimony only to "the wife who had obtained the divorce out of the property of her husband, not to exceed one-third of her husband's income." 110 So. at 332. Thus, the husband would have been proven to be "at fault" under then article 138 of the Civil Code because our law then allowed divorce only based on fault and did not allow a divorce for merely living separate and apart prior to 1916. When no-fault divorce was first recognized by Act 269 of 1916, allowing either party to obtain a divorce, there was no provision in LSA-C.C. art. 160 allowing alimony to a not-at-fault wife where the husband obtained the divorce based on seven years of living separate and apart. Thus, in 1928, article 160 was amended to allow alimony to the wife who proves she has not been at fault, where the husband obtained the "no-fault" divorce based on seven years of living separate and apart. This eliminated the required "fault" of the husband in granting alimony to the wife. In 1934, article 160 was amended to substitute the phrase "seven years or more" to "for a certain period of time" in light of the fact that the Legislature had reduced the seven year requirement to four years, and would later reduce it to two years, in 1938. The period is now 180 days from the service of a filed petition for divorce or six months. LSA-C.C. arts. 102 and 103. In 1979, article 160 was amended to allow alimony to the "spouse" who has not been at fault. Present article 112 is article 160 of the Louisiana Civil Code of 1870, as amended by Acts 1986, No. 229, Sec. 1. LSA-C.C. art. 112, Editor's note. Thus, we see from the beginning of alimony in Louisiana that "fault" played an extremely important role, as Planiol said it did in French law.
In Player, we characterized alimony after divorce as a "pension," stating as follows:
As the marriage is forever dissolved, there is no obligation arising from it. The law accords, not alimony in such a case, but a pension, to the unfortunate spouse who has obtained the divorce. This pension becomes revocable in case it should become unnecessary, and in case the wife should contract a second marriage.
Player, supra at 333 (citing State v. Judge, 114 La. 44, 38 So. 14 (1905); 3 Laurent, p. 403; Act 247 of 1916). Player was cited by this Court in 1940 for the proposition that alimony after divorce "is in the nature of a pension accorded by law to the wife without fault against whom a judgment of divorce has been rendered." Fortier v. Gelpi, 195 La. 449, 197 So. 138, 140 (1940) (citing Player, supra); see also Ward v. Ward, 339 So.2d 839 (La.1976) (legislatively overruled on other grounds by Act 72 of 1979, amending LSA-C.C. art. 160.) The Court in Fortier went even further and called this alimony a "pure gratuity" to be granted "in the discretion of the court." Id.
In Hays v. Hays, 240 La. 708, 124 So.2d 917 (1960), the husband argued that, since divorce dissolved the bonds of matrimony *89 and thus his obligation to support his wife, and since permanent alimony was "a mere gratuity," an award of permanent alimony constituted a taking of his property for private purposes in violation of the federal and state constitutions. 124 So.2d at 918. We disagreed and explained our definition of "gratuity" in the context of permanent alimony:
By this statement this court meant that after divorce there no longer exists an obligation under the marriage contract for the husband to support and maintain his wife, as this contract has been dissolved. In other words, the court had in mind that the wife after divorce no longer has the absolute right to demand of her divorced husband support and assistance since the dissolution of the marriage contract relieved him of that obligation; that consequently the right of the wife to be awarded alimony under Article 160 does not flow from the marriage contract, and that insofar as this contract is concerned, the alimony is a gratuity in the nature of a pension. However, the court's statement cannot be construed to mean that there is no obligation on the divorced husband to pay alimony under certain circumstances.
Divorce is not one of the inalienable rights granted by the federal or the state Constitution, and the lawmakers of the state may make laws regulating divorce and impose conditions under which a citizen of this state may obtain a divorce. Alimony is incidental and related to divorce, and its imposition is within the power which the lawmakers have to regulate and impose conditions for a divorce. Consequently, when the Legislature enacted Article 160 of the Civil Code, it was simply saying to a citizen of this state, as it had a constitutional right to do, that if cause exists for a divorce, it may be had subject to the condition that the court may in certain specified circumstances require the husband to pay alimony. By paying this alimony the husband is discharging an obligation imposed upon him by the court under authority of law, and his property is in no sense being unconstitutionally taken. (Emphasis added).
Id.
The first time in the jurisprudence that we find permanent alimony described as a means to keep women off public assistance is Justice Barham's dissent in Montz v. Montz, 253 La. 897, 221 So.2d 40 (1969). There, Justice Barham characterized permanent alimony as "socio-economic legislation ... intended to assign responsibility for the dependency of such divorced women so as to relieve them from destitution and the State from their care." 221 So.2d at 44 (dissenting opinion of Justice Barham). Likewise, relying on this statement, courts and commentators began to characterize permanent alimony as a means to keep divorced women from becoming wards of the state. See Loyacano v. Loyacano, 358 So.2d 304 (La.1978), vacated on rehearing, 358 So.2d 304 (La.1978), vacated and remanded, 440 U.S. 952, 99 S.Ct. 1488, 59 L.Ed.2d 766 (1979)[5] ("[t]he general policy consideration and practical reason which appear to have induced the legislature to provide alimony after divorce was to prevent divorced women without sufficient means from becoming wards of the state." 358 So.2d at 308-309, n. 12 (relying on Barham dissent in Montz)); Teasdel v. Teasdel, 493 So.2d 1165, 1168 (La.1986) ("[p]ermanent alimony is a pension which is designed to prevent a former spouse from becoming a public charge." (no citation)); Spaht, Katherine Shaw, Developments in the Law, 1979-1980, Persons, Rehabilitative Alimony, 41 La.L.Rev. 372 (1981) (the reason for alimony after divorce is to provide support for those who need it with a minimal amount of social dislocation "by extracting it from those who have provided similar maintenance in the past." (citing Montz dissent *90 and Loyacano, 358 So.2d at 309, n. 12)); Pugh, Nina Nichols, The Evolving Role of Women in the Louisiana Law: Recent Legislative and Judicial Changes, 42 La.L.Rev. 1571 (1982) ("[a]lthough the awarding of alimony after divorce was based originally upon a delictual principle in that the spouse from whom it was sought had breached his or her marital obligation of mutual support, such alimony came to represent a societal response to the needy who would otherwise become charges of the state." 42 La.L.Rev. at 1589 (citing Loyacano and later Montz dissent for same proposition)). Thus, commentators and courts, and in fact this Court on original hearing, base the proposition that permanent alimony was enacted to keep divorced spouses from becoming wards of the state on statements that were not law: Loyacano, which was vacated on rehearing and by the United States Supreme Court, and the dissenting opinion in Montz.
In light of the history of article 160, and courts' and commentators' interpretation of article 160, we must consider whether alimony after divorce is a "law enacted for the public interest" such that any waiver would be an absolute nullity. While other laws governing marriage and children are often enacted for the public interest and non-waivable, an examination and comparison of the laws in this area that have, and have not, been declared non-waivable provides valuable insight.
In Holliday v. Holliday, 358 So.2d 618, 620 (La.1978), we held prenuptial waivers of alimony pendente lite void as contrary to the public policy of this State, expressed in LSA-C.C. arts. 119, 120 and 148, that a husband should support and assist his wife during the existence of the marriage. We held that this legal obligation of support, as well as the fact that the conditions affecting entitlement to alimony pendente lite could not be foreseen at the time antenuptial agreements are entered, overrides the premarital anticipatory waiver of alimony. Id. at 620. We noted that we expressed no opinion on the antenuptial waiver of permanent alimony, reserving it for another day. Id., n. 6.
Thus, alimony pendente lite is based on the statutorily imposed duty of the spouses to support each other during marriage. See LSA-C.C. art. 98 ("Married persons owe each other fidelity, support, and assistance.") We have historically noted the difference between alimony pendente lite and permanent alimony. Player v. Player, supra. Comment (e) to LSA-C.C. art. 98 states that "[t]he spouses' duties under this Article, as a general rule are matters of public order from which they may not derogate by contract." On the other hand, there is no corresponding statutory duty of support mandating permanent alimony between former spouses.
While we have held that alimony pendente lite is a law enacted for the public interest, the reasoning behind Justice Calogero's argument in the Holliday dissent, that alimony pendente lite is not a law of public order, is really applicable to permanent alimony. Justice Calogero dissented, stating as follows:
Neither am I persuaded by relator's contention and the majority's inference that alimony pendente lite is, in the public interest, essential to avoid a wife's becoming a social burden and/or ward of the state. This attitude is a demeaning one which is inconsistent with the realities of the day. It is simply not correct to assume that all, or most, women are incapable of financial independence but must, instead, be wholly dependent upon either their husbands or the state.
Furthermore, in this case, as in almost all marriages where the spouses have entered into an antenuptial agreement, there is no community of acquets and gains. The wife thus has the same control over her property between separation and divorce as she had prior to separation and prior to marriage. An antenuptial waiver by the wife of alimony pendente lite would make the wife no more of a burden on the state than she was prior to marriage. I therefore view alimony pendente lite as a right which is provided for the benefit of the individual and not for the protection of public order and good morals.
Id. at 622 (Calogero dissent). In today's world, more women than ever are in the workforce and are capable of financial independence.[6] *91 Further, a waiver of permanent alimony would make the spouse incapable of financial independence no more of a burden than he or she was before marriage.
The Civil Code limits spouses' rights, before and during marriage, to renounce or alter the marital portion or the established order of succession. LSA-C.C. art. 2330. The legislature determined that these rules were rules of public order that may not be derogated by agreement. LSA-C.C. art. 2330, comment (a). We believe that had the legislature intended to limit spouses' rights to waive post-divorce alimony in the same way, it would have made this clear. Instead, the Civil Code contains no prohibition against the waiver of post-divorce alimony.
Further, the Civil Code limits individuals' rights in other areas where a derogation of such rights would result in the individual becoming a public burden. An individual is forbidden from divesting himself of all his property by a donation inter vivos. LSA-C.C. art. 1497. Also, the right to contract not to compete is limited. LSA-R.S. 23:921. "Both of these situations demonstrate the underlying state concern that a person cannot by convention deprive himself of the ability to support himself." Note, Louisiana's Forbidden Antenuptial Waiver of Alimony Pendente Lite, 39 La.L.Rev. 1161, 1168 (1979). But, as stated in the above case note, alimony is distinguishable:
To assume that a wife's waiver of alimony automatically occasions the danger that she will become a ward of the state is to assume that the only revenue which married women have is the salary earned by their husbands. Such an assumption is unrealistic in light of modern social trends....
Because waiver of alimony presents a severely limited likelihood that a spouse will become a ward of the state, this public interest should not be considered a public policy unlawfully contravened by the antenuptial waiver of alimony after divorce.
Id. at 1168, 1169, 1171. Clearly, a waiver of permanent alimony does not deprive a spouse of his or her ability to support herself.
In other situations involving spouses, waivers in certain areas are clearly allowed. The Civil Code gives spouses, before or during marriage, the right to enter into a matrimonial agreement as to all matters that are not prohibited by public policy. LSA-C.C. art. 2329. A "matrimonial agreement" is defined as "a contract establishing a regime of separation of property or modifying or terminating the legal regime." LSA-C.C. art. 2328. Thus, parties, before or during marriage, can waive their right to the legal regime. As with permanent alimony, this deprives a spouse of the other's earnings and property acquired during marriage that would otherwise become community property, and potentially involves greater consequences on the part of the non-earning spouse than would a waiver of permanent alimony, which is limited to one-third of the other spouse's income and is only to provide sufficient means for support.
We have also allowed a waiver of a court-ordered child support payment between divorced spouses where the agreement met the requirements for a conventional obligation and fostered the continued support and upbringing of the child. Dubroc v. Dubroc, 388 So.2d 377 (La.1980).[7] Further, we have held that "where a consent decree providing for alimony or child support is to be rendered, the parties may reserve the right to an initial judicial determination of a proper alimony or child support award and waive any requirements to prove a change of circumstances." Aldredge v. Aldredge, 477 So.2d 73, 74 (La. 1985). We held that such a waiver is not prohibited by the Civil Code and is not violative of public policy, partly because of the permissive nature of the right to seek a reduction or discharge in child support payments. Id.
*92 Another situation where waiver is allowed is post-separation waivers of alimony. In Nelson v. Walker, 250 La. 545, 197 So.2d 619 (1967), we characterized, in dictum, the post-separation waiver of alimony pendente lite and permanent alimony as a relative nullity caused by the then incapacity of spouses to contract with each other. 197 So.2d at 625. We stated that this nullity was susceptible of ratification once the incapacity ceased, i.e., upon divorce. Id.; see also Ward v. Ward, supra and Russo v. Russo, 205 La. 852, 18 So.2d 318 (La.1944). Former LSA-C.C. art. 1790 was amended in 1978, removing the incapacities of husband and wife to contract.
Subsequently, courts have allowed post-separation waivers of permanent alimony and alimony pendente lite. Klein v. Klein, 485 So.2d 970 (La.App. 5th Cir.), writ denied, 489 So.2d 921 (La.1986); deMontluzin v. deMontluzin, 464 So.2d 948 (La.App. 4th Cir. 1985); Jones v. Jones, 459 So.2d 1200 (La. App. 5th Cir.1984), writ denied, 462 So.2d 649 (La.1985) (post-separation waiver of permanent alimony valid); Braning v. Braning, 449 So.2d 670 (La.App. 4th Cir.1984); Cunningham v. Cunningham, 448 So.2d 910 (La. App. 3d Cir.1984) ("[a]limony after divorce can be made the subject of a contract and is considered a consent decree."); Beringer v. Beringer, 415 So.2d 429 (La.App. 1st Cir. 1982); King v. King, 390 So.2d 250 (La.App. 3d Cir.1980), writ denied, 396 So.2d 884 (La. 1981); Monk v. Monk, 376 So.2d 552 (La. App. 3d Cir.1979). Allowing a waiver of permanent alimony in return for a lump sum and treating it as a consent decree is in accordance with the provision of LSA-C.C. art. 112(B) that allows the court to award permanent alimony in a lump sum with the parties' consent.
To allow post-separation waivers of permanent alimony and not prenuptial waivers, as violative of the public order, would be incongruous. Either permanent alimony is a law established for the protection of the public interest, and, as such, a waiver of such is an absolute nullity under article 7, or it is not. On original hearing, "[w]e distinguish[ed] without overruling" most of the above cases allowing waivers of permanent alimony in post-separation agreements because there, "unlike in an antenuptial agreement, the conditions which affect entitlement to alimony after divorce can be foreseen at the time of the contract." McAlpine v. McAlpine, 95-1594, p. 6 (La.2/9/95). "Thus, the spouse who may be placed in necessitous circumstances by the agreement is in a much better position to protect him or herself and the risk that the spouse may become a ward of the state is significantly reduced." Id. at 6-7. However, on reconsideration, we find that such a distinction is not justified under article 7 of the Civil Code, which decrees any act in derogation of a law enacted for the protection of the public interest is an absolute nullity. The concept of foreseeability is generally not a requirement for valid contracts.
Finally, to hold that antenuptial waivers of permanent alimony are invalid as a matter of public policy would be illogical because permanent alimony is granted only to spouses not-at-fault. Surely the grant of permanent alimony to "innocent" spouses and not "guilty" spouses cannot be a law enacted for the public interest under LSA-C.C. art. 7. Is it really arguable that the state has an interest in keeping not-at-fault divorced spouses off state support but has no such interest in keeping at-fault divorced spouses off the public dole? It is much more probable that the legislature in originally providing for permanent alimony did it not to keep needy ex-wives off public support, but to attempt to rectify the loss suffered by an innocent wife at the hands of an at-fault husband. If preventing divorced spouses from becoming a public burden was really a law enacted for the public interest it probably would have applied to all wives (now spouses), innocent or not.
Our holding today is in accordance with the majority of states that now hold that antenuptial waivers of permanent alimony are not per se invalid as against public policy.[8] As stated by two family law commentators, *93 since 1970, with the advent of no-fault divorce and the changes in society that such laws represent, public policy has changed and the traditional rule that prenuptial waivers of permanent alimony were void ab initio has given way to the more realistic view that such agreements are valid and enforceable under certain conditions. Freed & Walker, Family Law in the Fifty States: An Overview (1985-1986), 19 Fam.Law Q. 331, 438. Rather than encouraging divorce, these agreements provide couples with the opportunity to plan for the future and safeguard their financial interests.[9] Without this option, potential spouses may choose to live together informally without the benefit of marriage. Thus, these agreements may actually encourage marriage in some instances.

CONCLUSION
We conclude that permanent alimony is not a law enacted for the public interest. Rather, it was enacted to protect individuals, i.e., not-at-fault divorced spouses in need. Thus, the prohibition found in article 7 of the Civil Code does not apply.
Article 2031 of the Civil Code establishes that "[a] contract is relatively null when it violates a rule intended for the protection of private parties, as when a party lacked capacity or did not give free consent at the time the contract was made." LSA-C.C. art. 2031. The rules applicable to the validity of premarital agreements waiving permanent alimony are the same as for other contracts, namely, the Civil Code articles dealing with capacity, consent, error, fraud, and duress. The trial court in this case found that the antenuptial agreement was not the result of fraud, error or duress and, after careful review of the record, we agree with the court of appeal that these findings were not manifestly erroneous. In addition, the trial court was not manifestly erroneous in finding that the Mercedes Benz was not a gift to Mrs. McAlpine.

DECREE
For the reasons stated herein, the judgment of the court of appeal, reversing the trial court's dismissal of Mrs. McAlpine's claim for permanent alimony, is reversed and the trial court's judgment of March 24, 1993 is reinstated. The judgment of the trial court holding that the Mercedes Benz was not a gift to Mrs. McAlpine is affirmed.
REVERSED IN PART; AFFIRMED IN PART.
CALOGERO, C.J., additionally assigns concurring reasons.
WATSON, J., dissented and would hold that the contract between the lawyer and his wife invalid for duress.
JOHNSON, J., concurring in part, dissenting in part and assigns reasons.
*94 CALOGERO, Chief Justice, additionally, assigns concurring reasons.
I respectfully concur in the judgment reversing the court of appeal's decision and reinstating the trial court's decision. I believe the majority is correct in its conclusion that C.C. art. 112 was not enacted for either the preservation of public order or good morals. Thus, C.C. art. 7 is not implicated in the waiver of permanent alimony by antenuptial agreement. I write separately to emphasize that in the absence of a provision enacted to protect the public interest, freedom of contract is the rule. "[F]reedom of parties to contract ... is essential to both our society and system of government." Holliday v. Holliday, 358 So.2d 618, 622 (La.1978) (Calogero, C.J., dissenting). Furthermore, this case presents a more compelling case than the Holliday case, as the former concerns a waiver of permanent alimony, whereas the latter concerned only a waiver of alimony pendente lite.
JOHNSON, Justice, concurring in part/dissenting in part.
I join the majority in concluding that antenuptial agreements waiving permanent alimony are enforceable, but dissent from the majority opinion that this agreement was entered into voluntarily.
This was not the typical arms-length negotiated contract. In fact, Mrs. McAlpine was presented with this pre-nuptial agreement one week prior to the wedding, and after the wedding invitations had been mailed. Neither Mr. McAlpine who is an attorney, or his attorney who drafted the document suggested to Mrs. McAlpine that she obtain legal counsel. All of the facts suggest coercion or overreaching to me, and I would set aside the antenuptial agreement.
For the foregoing reasons, I respectfully concur in part; and dissent in part.
NOTES
[*] Because of the vacancy created by the resignation of Dennis, J., now a judge on the United States Court of Appeals for the Fifth Circuit, there was no justice designated "not on panel" under Rule IV, Part 2, Sec. 3. Panel included Chief Justice Calogero and Justices Marcus, Watson, Lemmon, Kimball, Johnson and Victory.
[1] "Protection of the public interest" has the same meaning as "laws for the preservation of public order" and is sufficiently broad to include laws made for the preservation of good morals. See 1987 Revision Comments b and d, LSA-C.C. art 7.
[2] The other three categories, (1) Status and Capacity of Persons; (2) System of Proprietorship; and, (3) Protection of Third Persons, are inapplicable.
[3] Article 212 of the Code Napoleon contained the reciprocal duties of the spouses of fidelity, help and assistance during marriage.
[4] In Player, we recognized the similarities between article 160 and article 301 of the French Civil Code, and adopted the French jurisprudence under article 301 as sound and logical. Id.
[5] Loyacano was vacated and remanded by the United States Supreme Court in light of its decision in Orr v. Orr, 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979) (holding unconstitutional an Alabama statutory scheme of imposing alimony obligations on husbands but not wives as a violation of the Equal Protection Clause of the Fourteenth Amendment). Loyacano was also overruled by Lovell v. Lovell, 378 So.2d 418 (La.1979) (holding that LSA-C.C. art 160, prior to its amendment in 1979, was unconstitutional as a violation of the Equal Protection Clauses of the state and federal constitutions).
[6] Statistics compiled by the Department of Labor indicate that in 1991, 57.3 percent of all women 16 years of age and older were in the labor force. United States Dept. of Labor, 1993 Handbook on Women Workers: Trends and Issues.
[7] In Dubroc, the divorced parents agreed to suspend the mother's right to receive child support payments while the father supported and maintained the child in his own home.
[8] Brooks v. Brooks, 733 P.2d 1044 (Alaska 1987); Williams v. Williams, 166 Ariz. 260, 801 P.2d 495 (App.1990); Dingledine v. Dingledine, 258 Ark. 204, 523 S.W.2d 189 (1975); In re Marriage of Dawley, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976); Newman v. Newman, 653 P.2d 728 (Colo.1982); Parniawski v. Parniawski, 33 Conn.Sup. 44, 359 A.2d 719 (1976); Posner v. Posner, 233 So.2d 381 (Fla.1970); Scherer v. Scherer, 249 Ga. 635, 292 S.E.2d 662 (1982); Rossiter v. Rossiter, 4 Haw.App. 333, 666 P.2d 617 (1983); Volid v. Volid, 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); Boren v. Boren, 475 N.E.2d 690 (Ind.1985); Matlock v. Matlock, 223 Kan. 679, 576 P.2d 629 (1978); Osborne v. Osborne, 384 Mass. 591, 428 N.E.2d 810 (1981); Frey v. Frey, 298 Md. 552, 471 A.2d 705 (1984); Rinvelt v. Rinvelt, 190 Mich.App. 372, 475 N.W.2d 478 (1991); Hill v. Hill, 356 N.W.2d 49 (Minn.App. 1984); Ferry v. Ferry, 586 S.W.2d 782 (Mo.App. 1979); MacFarlane v. Rich, 132 N.H. 608, 567 A.2d 585 (1989); Marschall v. Marschall, 195 N.J.Super. 16, 477 A.2d 833 (1984); Fletcher v. Fletcher, 68 Ohio St.3d 464, 628 N.E.2d 1343 (1994); Freeman v. Freeman, 565 P.2d 365 (Okla. 1977) (waiver of property rights only but cited by Taylor v. Taylor, 832 P.2d 429 (Okla.App.1991) as establishing validity of waivers of permanent alimony); Unander v. Unander, 265 Or. 102, 506 P.2d 719 (1973); Karkaria v. Karkaria, 405 Pa.Super. 176, 592 A.2d 64 (1991); Bassler v. Bassler, 156 Vt. 353, 593 A.2d 82 (1991); Gant v. Gant, 174 W.Va. 740, 329 S.E.2d 106 (1985); Matson v. Matson, 107 Wash.2d 479, 730 P.2d 668 (1986); Hengel v. Hengel, 122 Wis.2d 737, 365 N.W.2d 16 (Wis.App.1985).

In addition, many of the above states, and others, have adopted the Uniform Premarital Agreement Act ("UPAA"), which expressly allows premarital waivers of support under certain conditions. That states that have adopted the UPAA are: Arizona, Arkansas, California, Connecticut, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Maine, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Texas, Utah and Virginia.
[9] The agreement in this case was not necessarily disadvantageous to Mrs. McAlpine. Under the terms of the agreement, she received at least $25,000 upon divorce, without having to prove that she was not at fault or that she was in need.