960 So.2d 174 (2007)
Janet Hall RAY
v.
Glen Phil RAY.
No. 2005 CA 0873.
Court of Appeal of Louisiana, First Circuit.
March 23, 2007.
*175 Carol J. Greenfield, Barnes and Greenfield, Baton Rouge, for Plaintiff-Appellee Janet Hall Ray.
Brian L. Williams, Baton Rouge, for Defendant-Appellant Glen Phil Ray.
Before: WHIPPLE, PARRO, GUIDRY, McDONALD, and HUGHES, JJ.
PARRO, J.
This case involves a rule to eliminate spousal support by Glen Phil Ray and a rule for contempt by Janet Hall Ray. From a judgment denying his motion to eliminate spousal support and ordering an accounting and transfer of certain assets, Mr. Ray appealed. For the following reasons, we affirm in part and reverse in part.

Facts and Procedural History
After being married for approximately 39 years, Janet Hall Ray and Glen Phil Ray were divorced by a consent judgment dated November 17, 1997. At the time of the divorce, Ms. Ray was suffering from a cerebral hemorrhage and was unable to work. Stipulations addressing the division of all investment, retirement, and annuity accounts, spousal support, and a health insurance plan for Ms. Ray were incorporated into the November 17, 1997 consent judgment. The pertinent provisions stated:
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is rendered herein awarding unto the parties an equal division of all investment, retirement and annuity accounts *176 presently identified as the Sun America in Anchor National Life Insurance Company and Westvaco Pension Account; and that the parties shall immediately execute any and all documents, including any Qualified Domestic Relations Order, necessary to effectuate the transfers of said accounts.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is rendered herein awarding unto the petitioner, JANET HALL RAY, spousal support and permanent alimony thereafter in the amount of ONE THOUSAND SIX HUNDRED AND NO/100'S ($1,600.00) DOLLARS per month, retroactive to August 8, 1996, and that the parties have previously divided the retirement and investment accounts of the parties and that each party shall receive a monthly annuity/retirement check. GLEN PHIL RAY shall pay, in the form of alimony, any and all sums which makes up the difference between the monthly retirement check received by petitioner and the amount of ONE THOUSAND SIX HUNDRED AND NO/100'S ($1,600.00) DOLLARS. Petitioner, JANET HALL RAY, shall notify defendant, GLEN PHIL RAY, of the monthly amount received and the difference in said amount shall be paid within fifteen (15) days of the receipt of the monthly annuity/retirement check by petitioner, JANET HALL RAY.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that judgment is rendered herein that it is recognizable that the principal of the investment, retirement and annuity accounts shall be available to petitioner; that the parties acknowledge that the spousal support payable by defendant unto petitioner is based upon the difference between the monthly investment, retirement and annuity proceeds and the sum of $1,600.00 per month; therefore, in the event of reduction of the principal amount by petitioner, such reduction shall create a change in circumstances and defendant shall be allowed to relitigate the issue of spousal support.
The judgment further obligated Mr. Ray to pay for Ms. Ray's health insurance premiums, 90 percent of her medical expenses that were not covered by insurance, and the insurance premium on her vehicle that belonged to the former community of acquets and gains.
On May 25, 2001, Ms. Ray filed a petition for partition, seeking an accounting and alleging that she no longer wished to remain co-owners in indivision with Mr. Ray of the property that belonged to the former community of acquets and gains between the parties. In his answer, Mr. Ray averred that the property in question formerly belonging to the community had been previously partitioned via the consent judgment and constituted their separate property as of November 17, 1997. According to his allegations, Ms. Ray's share of the balance of the investment, retirement, and annuity accounts equaled $115,682.80, and each was entitled to $451.85 of the monthly proceeds from the Westvaco pension fund annuity.
On August 27, 2002, Mr. Ray filed a rule to eliminate spousal support, based on allegations of a change of circumstances due to his looming unemployment. Shortly thereafter, Ms. Ray filed a rule for contempt, alleging that Mr. Ray had violated the terms of the consent judgment by failing to reimburse her for $5,075.22 in medical and prescription expenses, by failing to equally divide all investment, retirement, and annuity accounts, and by failing to make the principal amounts in these accounts available to her. In his answer to her rule, Mr. Ray averred that all rights *177 and interests in the retirement/annuity accounts had been transferred to Ms. Ray.
Following a hearing on January 27 and 29, 2003, on these matters, the trial court made the following pertinent findings. The terms of the November 1997 consent judgment amounted to a bargained-for arrangement, in essence a contract. Such an arrangement was enforceable, although it precluded an adjustment in spousal support even where there had been a change of circumstances. Finding that the wording of the stipulations in the judgment was ambiguous and unclear, the trial court considered parol evidence to determine the intent of the parties. Based on the testimony presented, the trial court found that the parties, with the advice of a financial planner, had intended that Ms. Ray receive $1,600 per month in spousal support indefinitely, due to her physical infirmities and her inability to work. Pursuant to the terms of the consent judgment, the funds to cover her spousal support obligation were first generated by the monies received from her share of the investment, retirement, and annuity accounts. If these amounts were less than $1,600 in any given month, Mr. Ray was obligated to pay the deficiency. In the event that Ms. Ray invaded the principal amount of her accounts, Mr. Ray would then, and only then, be allowed to relitigate the amount of the permanent support. Accordingly, the trial court found that the intent of the parties was for the amount of spousal support to remain the same, regardless of any change in circumstances, unless the change was the one specifically mentioned in the stipulation.
In the resulting judgment signed on July 16, 2003, Mr. Ray was found to be in constructive contempt of court for his failure to divide the community property. Additionally, Mr. Ray's rule to eliminate spousal support was denied, despite the fact that the evidence showed that Mr. Ray had been laid off, had incurred a large amount of credit card debt, and was depleting the principal portion of his retirement account. Each party's portion of the principal of the investment, retirement, and annuity accounts was declared to be $115,692, and Ms. Ray's request for past interest on her portion of the investment accounts was denied.
From the judgment denying his motion to eliminate spousal support, Mr. Ray filed a motion for a new trial. The motion was granted as to the following issues: whether permanent spousal support should be terminated or modified, whether Ms. Ray had received her portion of the investment funds, whether Mr. Ray was entitled to receive any amount remaining after Ms. Ray's portion was paid to her, and whether Mr. Ray should be ordered to continue paying automobile insurance premiums for Ms. Ray.
The new trial was held on May 27, 2004. In its reasons for judgment, the trial court reaffirmed its prior ruling that Mr. Ray was not entitled to a termination of his spousal support obligation. The provision allowing for relitigation of the issue of spousal support in the event that Ms. Ray depleted the principal was found to be tantamount to a non-modification clause. Furthermore, the trial court ruled that the parties did not contemplate a reduction in spousal support for monthly social security payments of $627, which Ms. Ray began receiving approximately four years after the judgment of divorce. Thus, the receipt of social security benefits was not to be considered in calculating the amount owed by Mr. Ray. According to the reasons for judgment, Mr. Ray's monthly spousal support obligation of $1,600 was subject to reduction by the monthly earnings on Ms. Ray's investment funds of $115,682.80 and the payments she received monthly from *178 the Westvaco pension fund annuity. In connection with Ms. Ray's rule for contempt, the trial court ordered an accounting of the interest gained on the investment accounts owned jointly by the Rays between the termination of the community and the division of the various accounts. The trial court also ruled that Mr. Ray was no longer obligated to pay automobile insurance premiums for Ms. Ray.
Mr. Ray appealed, contending that the trial court erred in finding that the spousal support obligation could not be modified due to a self-limiting non-modification clause contained in the consent judgment, in finding that he had not shown that he was entitled to have his spousal support obligation terminated or modified, and in ordering that he render an accounting of all interest gained during the time between the termination of the community and the division of the various accounts, without awarding him that interest.

Termination or Modification of Spousal Support Obligation
Whether the amount of spousal support[1] awarded through a consent judgment can be modified depends on the specific terms of the judgment.[2]Twichell v. Twichell, 00-1248 (La.App. 5th Cir.11/28/00), 772 So.2d 956, 959, writs denied, 01-0133 (La.3/23/01), 788 So.2d 428, and 01-0206 (La.3/23/01), 788 So.2d 429; Bland v. Bland, 97-0329 (La.App. 1st Cir.12/29/97), 705 So.2d 1158, 1161. To bar subsequent modification of the duration and/or amount of spousal support, the consent judgment must evidence a clear intent of the parties to do so. Bland, 705 So.2d at 1161. The mere listing of events which will terminate spousal support does not evidence a clear intent that the amount of spousal support can never be changed. Id. If the intent is not clear on the face of the judgment, other evidence, including but not limited to the testimony of the parties, a community property settlement, or a written stipulation, is admissible to determine the intent of the parties. Id. at 1163.
The issue to be resolved in this case is whether Mr. Ray, the obligor spouse bargained away, in part, his statutory right to have his spousal support obligation reduced or terminated due to a change in circumstances. See LSA-C.C. art. 112(A)(4) (1991); LSA-R.S. 9:311 (1997). Such a determination requires a thorough examination of the specific terms of the consent judgment for the intent of the parties.[3]
*179 The consent judgment in this case awarded "spousal support and permanent alimony" to Ms. Ray of $1,600 per month. Mr. Ray was ordered to pay, "in the form of alimony, any and all sums which makes up the difference between the monthly retirement check received" by Ms. Ray and $1,600. The next provision in the consent judgment clarified that "the spousal support payable by [Mr. Ray] unto [Ms. Ray] is based upon the difference between the monthly investment, retirement and annuity proceeds and the sum of $1,600.00 per month."[4] These particular provisions did not restrict the parties' statutorily-provided rights to modify the spousal support award, either as to duration or amount. Rather, they set forth the manner in which Mr. Ray's monthly spousal support obligation was to be calculated.[5] However, because Ms. Ray had the power to adversely affect the amount of her monthly investment, retirement, and annuity proceeds by reducing the principal in her account(s), thus increasing, in effect, Mr. Ray's spousal support obligation, the consent judgment expressly stated, at Mr. Ray's request, that a reduction by Ms. Ray of the principal amount was tantamount to a change in circumstances that would allow Mr. Ray to relitigate the issue of spousal support.
At the hearings on this matter, counsel freely questioned the witnesses called by Mr. Ray concerning the intent of the parties as to the amount and duration of the spousal support award. After reviewing the provisions of the consent judgment and deciding that they were ambiguous as to the duration and amount of the spousal support award, the trial court resorted to *180 parol evidence in determining their intent. The trial court's actions in this regard have not been challenged on appeal. Thus, we must determine if the parol evidence provides reasonable support for the trial court's finding that the parties intended that Ms. Ray's monthly spousal support award permanently remain at $1,600, absent a reduction in the principal amount of the money that she held in the investment, retirement, and annuity accounts.
The attorneys that represented Mr. Ray and Ms. Ray at the time the stipulated judgment was entered testified that Ms. Ray was to receive $1,600 per month in permanent support. The sum would be comprised of the checks from the various accounts and, if necessary to total $1,600, money from Mr. Ray. A financial planner, who had worked with the Rays in connection with Mr. Ray's contemplated retirement, testified that he worked with both parties to calculate how much Ms. Ray would need to live. According to the financial planner, a larger amount had been suggested, but the more bare-bone figure of $1,600 a month was agreed to by the parties after substantial bargaining. The testimony that Ms. Ray required $1,600 per month in order to live was uncontroverted. Also uncontroverted was the testimony that the parties intended for Ms. Ray to receive $1,600 per month due to her physical infirmities and her inability to work. According to Ms. Ray, payment of the $1,600 was never intended to change. She testified that she would never have agreed to refrain from touching her share of the principal amount if the amount of her spousal support would have been subject to change.
Considering her medical condition, the trial court found it hard to imagine that Ms. Ray would have agreed to a lower figure if she believed her spousal support could be reduced as she aged. In light of the evidence presented, we are unable to find manifest error as to the trial court's finding that the parties intended that the $1,600 monthly spousal support award in Ms. Ray's favor be permanent and subject to change only in the event that she caused a reduction in the principal amount of the specified funds. Based on this evidence as to the intent of the parties, we are unable to find error in the trial court's finding that, pursuant to the terms of the consent judgment, Mr. Ray's spousal support obligation would not be subject to modification as to amount or duration unless the change of circumstances listed in that judgment occurred.

Calculation of Spousal Support
Mr. Ray sought to have the trial court recognize his right to a reduction in his spousal support obligation for the amount Ms. Ray received monthly in social security benefits. The trial court found that he was not entitled to such a reduction, since it had not been contemplated by the parties.
Although Mr. Ray testified that they discussed social security benefits being a part of the calculation of his support obligation, we recognize that the consent judgment provides for the manner in which the $1,600 would be derived. The $1,600 award was to be reduced by the monthly retirement check to which Ms. Ray was entitled in determining Mr. Ray's monthly obligation. Thus, the "check" represented the proceeds to which Ms. Ray was entitled from the annuity, retirement, and investment accounts of the parties that had supposedly been divided.[6] During the testimony *181 of the financial planner and Ms. Ray's former attorney, neither mentioned social security benefits as being discussed as part of the spousal support obligation. Instead, they specifically referred to the Vanguard Fiduciary Trust Company (Vanguard) check in the amount of $101,141.61, the Georgia-Pacific Salaried Employee Retirement Plan (Georgia-Pacific) check in the amount of $130,224, and the Westvaco pension fund annuity which paid out a total of $903.69 monthly. Ms. Ray confirmed that there had never been any discussion about the subtraction of future social security benefits that she might receive from the amount of spousal support to which she was entitled. Notably, Ms. Ray did not begin receiving social security benefits until approximately four years after the 1997 consent judgment. Since a reduction for receipt of such benefits was clearly not contemplated by the parties, we are unable to find error in the trial court's determination that Ms. Ray's monthly social security benefits were not to be used in calculating Mr. Ray's actual spousal support obligation. Although we recognize that this holding results in a windfall to Ms. Ray, we note that the consent judgment is binding on both parties. See LSA-C.C. art. 3078. Just as Ms. Ray would not be entitled to benefit from a windfall that might occur in the future to Mr. Ray, he is not entitled to benefit from this windfall in her favor. Had the parties intended to have future social security benefits payable to Ms. Ray considered in determining Mr. Ray's spousal support obligation, they would have included a provision to that effect in the paragraph that expressly sets forth the manner in which Mr. Ray's monthly spousal support obligation would be calculated. Such a result illustrates the importance of considering and covering all known or possible eventualities when negotiating and arriving at a stipulation regarding spousal support.

Accounting
In connection with Ms. Ray's rule for contempt, the trial court ordered an accounting of the interest gained on the investment accounts owned jointly by the Rays between the termination of the community and the division of the various accounts. In its reasons for judgment, the trial court found that as of May 27, 2004, the parties had executed a Qualified Domestic Relations Order to have the Westvaco pension fund annuity payments divided and that Mr. Ray had transferred control in January 2003 of approximately $115,682.80 to Ms. Ray. This amount represented her one-half share of the $101,141.61 and the $130,224 checks that Mr. Ray received from Vanguard and Georgia-Pacific, respectively.
Although it recognized that the parties had stipulated in the consent judgment that all retirement and investment accounts were to be divided equally, the trial court observed that nothing in the consent judgment suggested that the division of the principal amount was a settlement of their community property. Finding that this property still belonged to the former community, the trial court, relying on LSA-C.C. art. 2338, declared that the earnings on these accounts were community property. The trial court rationalized that it would be inequitable to penalize Ms. Ray for Mr. Ray's contemptuous behavior in failing to timely divide the retirement accounts. Accordingly, the court ordered that an accounting be made of the interest gained and that the various accounts be divided within three months of the signing of the judgment.
Notably, the consent judgment, which granted a divorce in favor of Ms. Ray, awarded the parties "an equal division of all investment, retirement and annuity accounts presently identified as the Sun *182 America in Anchor National Life Insurance Company and Westvaco Pension Account." The judgment required that the parties immediately execute any and all documents necessary to effectuate the transfer of said accounts.
In light of Mr. Ray's failure to effectuate the transfer of Ms. Ray's portion of the money, as directed in the November 1997 consent judgment, Ms. Ray filed a petition for partition on May 25, 2001. In his response to the petition for partition, Mr. Ray averred that the property in question had been previously partitioned by the consent judgment and constituted their separate property as of November 17, 1997. He maintained that Ms. Ray had been receiving, on a monthly basis in the form of alimony, the entirety of the interest from the investment of her portion of the principal amount, plus her portion of the Westvaco pension fund annuity.
Apparently after recognizing the merit in Mr. Ray's assertions, Ms. Ray filed a rule for contempt in which she admitted that the consent judgment awarded the parties an equal division of all investment, retirement, and annuity accounts.[7] She urged that Mr. Ray had violated the provisions of the consent judgment by failing to equally divide all investment, retirement, and annuity accounts, since all of these accounts remained under his sole possession and control, and by failing to make the principal of these accounts available to her.
Based on such partition, the investment, retirement, and annuity accounts, then identified as the Sun America in Anchor National Life Insurance Company and Westvaco Pension Account, no longer retained their classification as former community property. Following the partition, the Rays were no longer co-owners of the property, as such property became the separate property of the party to which it was adjudicated. See Drobnak v. Drobnak, 97-0021 (La.App. 1st Cir.2/20/98), 708 So.2d 1162, 1165. Accordingly, the trial court erred in its classification of the civil fruits produced by these accounts. Thus, the earnings on Ms. Ray's portion of the money constituted her separate property, which should be considered in determining Mr. Ray's financial obligation for the payment of spousal support under the terms of the consent judgment. The fact that Mr. Ray was allowed to manage Ms. Ray's portion of the property following the November 1997 consent judgment does not change the classification of this property.
The evidence reveals that Mr. Ray ultimately deposited the funds in question in three accounts with Sun America[8] and that he seemingly had difficulty transferring Ms. Ray's portion of the funds to which she was entitled. Following their separation, Mr. Ray monitored and managed the accounts, without consultation with Ms. Ray. Ms. Ray testified that Mr. Ray did not do anything intentional to prevent the transfer; rather, he just made no effort to have it transferred. Until the filing of her petition for partition on May 25, 2001, and/or motion for contempt in the later part of 2002, she had not sought to enforce her right to obtain the release of her portion of the funds from Mr. Ray's control.
*183 Although we do not look with favor on Mr. Ray's noncompliance with the terms of the consent judgment relative to the transfer of these funds, Ms. Ray could have filed an action for the execution of the partition judgment and/or a motion for contempt when Mr. Ray's non-compliance became apparent to her, rather than waiting until May 25, 2001, or late 2002. See Williams v. Perry, 436 So.2d 1268, 1269-70 (La.App. 1st Cir.1983). Furthermore, as a result of his "contemptuous behavior," Mr. Ray was held to be in constructive contempt of court for failing to divide the former community property, as required by the terms of the consent judgment, and Ms. Ray was awarded $500. She has not appealed from that judgment, nor has she raised this as an issue in an answer to Mr. Ray's appeal.
Having determined that the earnings on Ms. Ray's portion of the funds were her separate property to be used in implementing the terms of the consent judgment, we must consider whether the trial court's order of an accounting of the interest gained on the investment accounts before a division of the accounts was appropriate under the facts of this case. Initially, Mr. Ray testified that he did not know how much Ms. Ray's portion of the invested funds had earned between the signing of the consent judgment and the transfer of $115,682.80 to Ms. Ray in January 2003. Subsequently, he explained that the monthly earnings on Ms. Ray's portion of the proceeds in the investment accounts did not exceed $1,600, seemingly without consideration being given to her portion of the monthly Westvaco annuity payment, $451.85.
According to Mr. Ray, the money from Vanguard was placed into an annuity account with Sun America which was intended for his benefit and thus managed aggressively, with approximately $94,112 of the funds received from Georgia-Pacific being placed in a separate fixed rate annuity intended for Ms. Ray. The remainder of the money from Georgia-Pacific was placed into a mutual fund which was owned proportionately by each. Thus, the question becomes whether Ms. Ray's monthly earnings exceeded $1,148.15,[9] such that Mr. Ray would have had no personal liability for the payment of any portion of the spousal support and Ms. Ray would be entitled to an accounting of the excess earnings.
Mr. Ray offered documentary evidence to show the annual earnings of the three Sun America accounts. The statements from the account with the funds from Vanguard intended for Mr. Ray simply reflect the quarterly change in the account value. The account was opened in September 1996 with $101,197.87. The following changes occurred in the year-end value of the account: $103,265.46 in 1996, $118,965.26 in 1997, $136,952.31 in 1998, $173,398.29 in 1999, $154,933.74 in 2000, $136,730.22 in 2001, and $111,942.98 in 2002. Over the six-year period, this account experienced a net increase in value of $10,745.11.
As to the Sun America annuity account that was intended for Ms. Ray's benefit, Mr. Ray deposited $94,112 of the funds from Georgia-Pacific in October 1996. Documentary evidence offered by Mr. Ray reflects the following in annual earnings on this account: $6,049 in 1997, $3,912 in 1998, $3,659 in 1999, and $4,620 in 2000. After incurring a surrender penalty, $111,160.88 was withdrawn from this Sun America account in November 2000 and placed into an AmerUs Multi Choice Annuity. The annual earnings on the AmerUs account were $757.44 in 2000, *184 $1,559.63 in 2001, and $2,479.05 for the first three quarters of 2002.
The remainder of the Georgia-Pacific funds, $36,112, was rolled over into a mutual fund with Sun America in September 1996. The total earnings produced by this account were $975.91 in 1996, $3,198.21 in 1997, $3,486.54 in 1998,[10] $2,862.73 in 1999, $3,014.66 in 2000, $3,089.74 in 2001, and $2,196.19 in 2002. According to Mr. Ray, he and Ms. Ray shared proportionately in this account. Although an exhibit that was offered at trial shows Ms. Ray as owning a 40.27 percent interest in this mutual fund, it is seemingly Mr. Ray that possessed such an interest, with Ms. Ray owning the other 59.73 percent interest. This observation is being made based on the amounts originally set aside for investment into the two Sun America annuities, $101,141.61 for Mr. Ray's annuity and $94,112 for Ms. Ray's annuity. With each being entitled to $115,682.80 of the total funds received from Vanguard and Georgia-Pacific, ownership of the remaining $36,112 would be comprised of $14,541.19 or 40.27 percent in Mr. Ray and $21,570.80 or 59.73 percent in Ms. Ray.
Using the annual earning figures from the annuity intended for Ms. Ray and 59.73 percent of the annual earnings produced by the mutual fund, we arrive at the following average monthly earnings on Ms. Ray's portion of the funds that were being managed by Mr. Ray:

 Annuity Mutual Total
 Fund Monthly
 (59.73%) Earnings
 1997 504.08 159.19 663.27
 1998 326.00 173.54 499.54
 1999 304.92 142.49 447.41
 2000 448.08 150.05 598.13
 2001 129.97 153.79 283.76
 2002 275.45 109.32 384.77

Clearly the average monthly earnings on the portion of the funds owned by Ms. Ray never reached or exceeded $1,148.15. Therefore, the difference between the $1,148.15 portion of the stipulated spousal support and the monthly earnings attributed to Ms. Ray's share of the funds was always paid by Mr. Ray from his separate funds. Accordingly, there were no excess earnings for which Ms. Ray was entitled to an accounting.[11] Based on the accounting made by Mr. Ray in this proceeding, we conclude that the trial court erred in ordering a further accounting by Mr. Ray.

Decree
For the foregoing reasons, that portion of the judgment which ordered an accounting of the interest gained on the investment amounts owned jointly by the Rays is reversed. Otherwise, the judgment is affirmed. Costs of this appeal are assessed to Glen Phil Ray.
AFFIRMED IN PART AND REVERSED IN PART.
GUIDRY, J., concurs in the result.
MCDONALD, J., dissents and assigns reasons.
HUGHES, J., dissents with reasons.
McDONALD, J., dissenting in part and agreeing in part.
I agree with the majority opinion except I disagree with their conclusion regarding the existence of a non-modification clause. Whether a provision qualifies as a non-modification clause depends on a careful examination of the specific terms of the consent judgment. I believe the trial *185 court committed error in finding the clause to be ambiguous and, therefore, allowing parol evidence to show the parties' intent. The parties do not agree as the reason for the introduction of parol evidence at the hearing. Ms. Ray suggests it was to show the parties' intent and meaning of the clause. Mr. Ray suggests it was to clarify whether or not Ms. Ray was allowed to invade the principal portion of the investment. I do not find any ambiguity in the clause. Further, whether a contract/clause is ambiguous is a question of law. Parties cannot stipulate to the disposition of legal issues. While Ms. Ray was allowed to reduce the principal portion of the investment "such reduction shall create a change in circumstances and defendant shall be allowed to relitigate the issue of spousal support." While creating one instance that would create a change in circumstances, it certainly does not create the only instance.
A non-modification clause effectively eliminates the rights of a party. Thus, there should be no question whatsoever about whether such a clause exists. The clause should unequivocally set forth the issues involving non-modification. It should demonstrate the clear intent of the parties to bar subsequent modifications of the amount of the award. Bland v. Bland, (La.App. 1 Cir. 12/29/97), 705 So.2d 1158, 1161. This clause does not demonstrate such an intent. The majority has cited several cases and the clauses in each are instructive.
In Ellefson v. Ellefson, (La.App. 5 Cir. 3/17/93), 616 So.2d 221, writ denied, 617 So.2d 1183 (La.1993), the child support provision provided, "[T]his contractual amount of child support is not subject to increase or decrease for any reason whatsoever." Similarly, the amount of alimony also had the same condition, that it "is not subject to increase or decrease for any reason whatsoever." The trial court denied any attempt to modify the alimony agreement finding it was a non-modification clause and was subject to the law of transaction or compromise. However, the court concluded that child support agreements are always subject to modification upon a showing of a change in circumstances regardless of language to the contrary. The appellate court affirmed both. In the case sub judice the issue is spousal support or alimony and not child support. The language in Ellefson is plain, unambiguous, and clear. There can be no question by either party or by anyone else what the provision means. It plainly states that there will not be an "increase or decrease for any reason whatsoever." In other words, it will not be modified for any reason whatsoever.
In Megison v. Megison, (La.App. 5 Cir. 9/14/94), 642 So.2d 885, the court upheld the non-modification clause as it pertained to alimony, but remanded the case for a determination of how much of the award was for alimony and how much was for child support since the child support portion was subject to future modification regardless of the language used. The language at issue provided:
. . . said sum to continue until the death or remarriage of Mary Elizabeth Monteleone Megison or until a final finding that she is guilty of living in open concubinage as that term is used in LCC art. 160. There are the only termination or modification events. However, in the event that Dr. Megison's salary falls below $20,000.00 gross per month and $15,000.00 net after tax income per month, then and in that event Dr. Megison will pay the defendant one-half (1/2) of his net after tax income per month, with the monthly shortfall between $7,000.00 and the reduced amount to be made up at the end of the year out of *186 bonuses or other funds from his employment if existing.
Unlike the provision in the case at bar, this provision provides very explicitly what the modification events are.
In Bland v. Bland, (La.App. 1 Cir. 12/29/97), 705 So.2d 1158, 1161, the court found the provision addressed only the duration of the spouse's entitlement to alimony, not the right of the parties to later seek a modification of the amount. The provision at issue provided that alimony would be paid until Mrs. Bland remarries. Thus, it was not a non-modification clause.
In Stout v. Stout, (La.App. 3 Cir. 10/7/98), 719 So.2d 727, 729, the court held that "[T]he simple fact that a judgment provides that alimony is "payable until death or remarriage" does not evidence a clear intent that the amount of alimony payable is not subject to modification." Thus, the court, as in Bland, found the phrase was not a non-modification clause.
In Twichell v. Twichell, (La.App. 5 Cir. 11/28/00), 772 So.2d 956 the clause at issue provided that the "payments will continue until she remarries or until defendant retires, whichever event occurs sooner, or as otherwise provided by law." While neither triggering event had occurred, the court found that the phrase "or as otherwise provided by law" was enough authority to allow for an attempt to modify the amount of alimony that was being paid. Thus, again, this was not clearly an attempt to create a non-modification clause.
In the two cases where a non-modification clause was found, the clause is clear and unequivocal. There can be no question about the intent of the parties. I cannot agree that the clause at issue herein provides such a clear, unequivocal intent by the parties to forbid future modifications. Therefore, for the foregoing reasons I respectfully dissent in that portion of the majority opinion affirming the finding of a non-modification clause.
HUGHES, J., dissenting.
I respectfully dissent.
The clause at issue as a matter of law is not a non-modification clause.
Although some evidence apparently was taken, I think the matter should be remanded so that full evidence, including both parties' social security, can be taken without the misconception of the non-modification clause limiting the evidence or skewing the application of the correct burden of proof.
NOTES
[1] In 1997, the Louisiana Civil Code articles governing spousal support, including Article 112 pertaining to permanent spousal support, were amended by 1997 La. Acts, No. 1078, § 1, effective January 1, 1998. Ms. Ray filed her petition for divorce and support before this date; therefore, the former substantive support provisions apply. See LSA-C.C. art. 6.
[2] Permanent spousal support is not a matter of public order about which couples are forbidden to contract under LSA-C.C. art. 7. Instead, spouses are permitted to contract concerning permanent spousal support at any time before or during marriage, or after divorce. See McAlpine v. McAlpine, 94-1594 (La.9/5/96), 679 So.2d 85, 87.
[3] In ruling on this matter, we considered the following jurisprudence that has addressed the validity of various non-modification clauses. The consent judgment in Megison v. Megison, 94-152 (La.App. 5th Cir.9/14/94), 642 So.2d 885, 888, writ denied, 94-2823 (La.1/13/95), 648 So.2d 1344 (abrogated on other grounds), provided for a monthly payment of $7,000 by Dr. John W. Megison for the support of Ms. Megison and his minor child, with such payment "to continue until the death or remarriage of [Ms.] Megison or until a final finding that she is guilty of living in open concubinage as that term is used in LSA-C.C. art. 160." Id. at 886-87. The judgment further provided:

These are the only termination or modification events. However, in the event that Dr. Megison's salary falls below $20,000.00 gross per month and $15,000.00 net after tax income per month, then and in that event Dr. Megison will pay the defendant one-half (1/2) of his net after tax income per month, with the monthly shortfall between $7,000.00 and the reduced amount to be made up at the end of the year out of bonuses or other funds from his employment if existing.
Id. at 887. Following a hearing on a rule to reduce his child support obligation, the court found that to the extent that the $7,000 award, with a non-modification provision, was for spousal support, it was legal, enforceable, and not subject to modification. Id. at 888. Since none of the specified termination or modification events had occurred, the court found that Dr. Megison had failed to state a cause of action for a reduction in spousal support. Id. at 888.
In Ellefson v. Ellefson, 616 So.2d 221, 222-23 (La.App. 5 Cir.1993), writ denied, 617 So.2d 1183 (La.1993), a provision for permanent periodic alimony of $6,000 per month for twenty years, "not to be subject to increase or decrease for any reason whatsoever," was found to contain a specific prohibition against modification, thus amounting to a non-modification clause. Such a contract, even though providing for alimony in excess of one-third of the payor's income, was found not to be in derogation of public law and constituted the law between the parties. Id. at 223.
Where a stipulation in a consent judgment set forth a schedule of decreasing payments of alimony until the mortgage on the home was paid off, and thereafter specified a sum payable until the payee spouse died or remarried, the court in Stout v. Stout, 97-1508 (La.App. 3rd Cir.10/7/98), 719 So.2d 727, found that the trial court erred in sustaining an exception raising the objection of no cause of action in a rule by the payor spouse to decrease permanent alimony. This finding was based on the fact that the stipulation was silent as to whether the parties intended to prohibit modification based on a change in circumstances and the pleadings raised serious questions about the intent of the parties. Id. at 730.
[4] Ms. Ray was required to notify Mr. Ray of the monthly amount received. He was obliged to pay the difference within 15 days of Ms. Ray's receipt of the monthly annuity/retirement check.
[5] Notably, the consent judgment did not expressly provide for the termination of spousal support in accordance with the law. See LSA-C.C. art. 112(A)(4) (1991).
[6] The judgment provided that the principal of the investment, retirement, and annuity accounts were to be available to Ms. Ray.
[7] While the partition of the community property in question may not have formed a demand of Ms. Ray's petition for divorce, it was apparently agreed on by the mutual consent of the parties. Therefore, this agreement formed a valid and enforceable portion of the consent judgment. See McLain v. McLain, 486 So.2d 1044, 1047 (La.App. 2nd Cir.1986).
[8] Prior to their separation, Mr. Ray and Ms. Ray worked with their financial advisor and chose Sun America.
[9] $1,600 less $451.85 (Westvaco annuity payment) equals $1,148.15.
[10] This account was reduced by $12,500 on August 5, 1998, on account of a withdrawal by Mr. Ray.
[11] We are confident that the absence of the $12,500 withdrawal by Mr. Ray from the mutual fund in August 1998 would not have resulted in a contrary ruling.